

FILE
IN CLERKS OFFICE
SUPREME COURT, STATE OF WASHINGTON

DATE MAR 07 2013

Madsen, C.J.
CHIEF JUSTICE

This opinion was filed for record
at 8:00 am on March 7, 2013

Ronald R. Carpenter
Supreme Court Clerk

# IN THE SUPREME COURT OF THE STATE OF WASHINGTON

| | |
|---|---|
| In the Matter of the Determination of the Rights to the Use of the Surface Waters of the Yakima River Drainage Basin, in Accordance with the Provisions of Chapter 90.03, Revised Code of Washington<br><br>STATE OF WASHINGTON, DEPARTMENT OF ECOLOGY,<br><br>       Respondents/Cross-Appellant,<br><br>v.<br><br>JAMES J. ACQUAVELLA; UNITED STATES; YAKAMA NATION; AHTANUM IRRIGATION DISTRICT; JOHN COX DITCH COMPANY; LA SALLE HIGH SCHOOL; DONALD and SYLVIA BRULE; JEROME DURNIL; and ALBERT LANTRIP; DEPARTMENT OF NATURAL RESOURCES,<br><br>       Appellants/Cross-Respondents. | NO. 86211-7<br><br><br><br>EN BANC<br><br><br><br>Filed _____ MAR 07 2013 |

STEPHENS, J.—This case concerns the adjudication of water rights in the

Yakima River Basin. The parties, as appellants and cross-appellants, bring various

challenges to the conditional final order of the trial court determining the parties' water rights. The Court of Appeals transferred the case to this court for direct review.

We affirm the trial court's determination that the decision in *United States v. Ahtanum Irrigation District*, 330 F.2d 897 (9th Cir. 1964) was an adjudication of nontribal water rights, but we reverse the trial court's decision concerning the quantification of irrigable land on the reservation, remanding for further proceedings. We also reverse the trial court's determinations regarding the Yakama Indian Nation's (the Nation) right to store water, affirm the trial court's conclusions regarding the rights of nontribal claimants to so-called excess water, reverse the trial court's application of the "future development" excuse under RCW 90.14.140(2)(c) for nonuse of a water right, affirm the trial court's denial of several individual water rights claims, and remand to the trial court to correct an apparent clerical error regarding an individual parcel belonging to the Chancery (the Catholic Bishop of Yakima).[1]

---

[1] At the close of briefing, several assignments of error were uncontested. First, the Nation assigned error to the trial court's determination that the Nation's right would be held in the name of the "United States of America, Bureau of Indian Affairs, as trustee for the Yakama Nation, Allottees, and Non-Indian Allottee Successors." Clerk's Papers (CP) at 174 (Conditional Final Order). The Nation asks that the reference to "Non-Indian Allottee Successors" be struck. No party has presented an argument to the contrary. We therefore reverse the trial court and remand for a revision of the name by which the Nation's right is held.

Second, the Nation assigned error to the trial court's refusal to recognize a right for the Nation to divert water from Ahtanum Creek between April 1 and April 14 of each year, subject only to John Cox's rights. No party has contested this assignment of error. We remand to the trial court for confirmation of a right for the Nation to divert water from Ahtanum Creek in its entirety from April 1 to April 14, subject to John Cox's rights and subject to minimum instream flows necessary to support fish and other aquatic life.

## BACKGROUND

By way of geographic orientation, the Yakima River is a tributary of the Columbia River, commencing at the crest of the Cascade Range near Snoqualmie Pass and generally flowing southeasterly for 175 miles before emptying into the Columbia. *Dep't of Ecology v. Acquavella*, 100 Wn.2d 651, 652-53, 674 P.2d 160 (1983) (*Acquavella* I). Its major tributaries are the Kachess River, the Cle Elum River, the Teanaway River, Ahtanum Creek, Toppenish Creek, Satus Creek, and the Naches River. *Id.* at 653. The case before us focuses on the rights to the water of one of those major tributaries, Ahtanum Creek. The adjudication of the Ahtanum Creek Subbasin has considerable history behind it. Before turning to the merits of the present dispute, it is helpful to consider the factual background and procedural posture of this case.

*General Background*

In the spring of 1977, meteorologists predicted record drought for the Yakima River Basin. Sidney P. Ottem, *The General Adjudication of the Yakima River: Tributaries for the Twenty-First Century and a Changing Climate*, 23 J. ENVTL. L. & LITIG. 275, 286 (2008). Up to that point, several water rights holders in the basin had been exercising their rights pursuant to a 1945 consent judgment

---

Third, the Nation claims that the trial court erred in confirming a nondiversionary stock water right to the Department of Natural Resources (DNR) with a priority date senior to all other, except the Nation's instream right to fish, without adequate evidence as to the relative priority dates. DNR does not contest this assignment of error. We remand for the entry of findings of fact on the priority dates and further conclusions of law as appropriate.

entered in federal court. *Id.* at 285.[2] The drought prediction, which threatened to severely curtail available water in the basin, prompted several irrigation districts to ask the federal court to modify the 1945 consent judgment. *Id.* at 286. The Nation sought to intervene. The federal court suggested a state court general adjudication. *Id.*[3]

In October 1977, the Department of Ecology (DOE), pursuant to chapter 90.03 RCW, filed an action to seek a general adjudication of the surface water in the Yakima River Basin. *Acquavella* I, 100 Wn.2d at 652. "A general adjudication, pursuant to RCW 90.03, is a process whereby all those claiming the right to use waters of a river or stream are joined in a single action to determine water rights and priorities between claimants." *Id.* at 652. It is akin a quiet title action. Ottem, *supra*, at 285. The adjudication is overseen by the superior court in which the action is filed but the court may appoint a referee or other judicial officer to assist the court. RCW 90.03.160.

The Yakima River Basin encompasses 6,062 square miles. *Acquavella* I, 100 Wn.2d at 654. Due to its size, the general adjudication involves thousands of parties. *Id.* at 653. In 1989, the trial court split the case into four procedural pathways, providing that the rights of the parties would be determined in the following order: (1) federal reserved right for Indian claims, (2) federal reserved

---

[2] *Kittitas Reclamation Dist. v. Sunnyside Valley Irrigation Dist.*, No. 21 (E.D. Wash. Jan. 31, 1945) (order granting consent decree).

[3] Although the Department of Ecology took up the federal court's suggestion and filed a state court general adjudication, the challenge to the consent decree proceeded in federal court. The decree was affirmed in *Kittitas Reclamation District v. Sunnyside Valley Irrigation District*, 626 F.2d 95 (9th Cir. 1980).

rights for non-Indian claims, (3) state-based rights of major claimants, and (4) state-based rights for other claimants, by subbasin. *Dep't of Ecology v. Yakima Reservation Irrigation Dist.*, 121 Wn.2d 257, 262, 850 P.2d 1306 (1993) (*Acquavella* II). Given its scope, this is not the first time the *Acquavella* adjudication has been before this court, but this is the first time we have considered individual rights to the waters of Ahtanum Creek Subbasin in the context of this adjudication.

The case before us now is part of the adjudication of the water rights for the surface waters in "Subbasin Number 23" of the Yakima River Basin, also known as the "Ahtanum Creek Subbasin." Proceedings concerning Subbasin Number 23 began in approximately 1993. *See* Clerk's Papers (CP) at 1500. The Ahtanum Creek Subbasin is the final subbasin to be considered in the larger water adjudication of the Yakima River Basin that began in 1977. Br. of Appellant/Resp't John Cox Ditch Co. (Br. of John Cox) at 2. It therefore appears to fall into the final pathway—state-based rights for other claimants by subbasin—but in fact the Ahtanum Creek Subbasin is "extraordinary" among the subbasins of the Yakima River Basin. CP at 977. Ahtanum Creek forms the northern boundary of the Yakama Indian Reservation. CP at 1501. The subbasin is thus home to not only individual water rights holders, but also major claimants including the United States as trustee to the Nation, the Nation, the Ahtanum Irrigation District, and the John Cox Ditch Company (John Cox). Accordingly, the claimed rights of all the individual holders in the subbasin, as well as the claimed rights of those major

claimants, were consolidated for presentation in one proceeding. Yakama Nation's Corrected Opening Br. (Yakama Nation Br.) at 7.

The proceeding was presided over first by Judge Walter A. Stauffacher, then by Court Commissioner Sydney P. Ottem, and then by Judge F. James Gavin. In 2002, having already made a number of discrete rulings and conducted fact-finding, the trial court issued a 481-page report of the court concerning the water rights for the Subbasin Number 23 (Ahtanum Creek). It incorporated the earlier rulings and made a number of rulings apportioning the water. CP at 974 (beginning of report). In March 2003, the parties filed their "exceptions," i.e., objections to the 2002 report. CP at 725. Additional evidentiary hearings took place. In 2008, the court issued a 388-page supplemental report. CP at 722. Another round of exceptions followed. CP at 532, 456. In April 2009, having considered all of the evidence and exceptions, the trial court issued a conditional final order, incorporating or revising its previous rulings. CP at 129. In May 2009, it issued an order on motions for reconsideration, granting several motions for reconsideration while denying others, incorporating those changes into its conditional final order.[4] CP at 74. This appeal followed.

---

[4]The relevant rulings are Memorandum Opinion Re Ahtanum Watershed Practicably Irrigable Acreage (1994) (CP at 1500-13); Report of the Court Concerning the Water Rights for the Yakama Indian Nation (1995) (CP at 3913-4005); Report of the Court Concerning the Water Rights for the Subbasin No. 23 (Ahtanum Creek) (2002) (CP at 974-1459); Memorandum Opinion Re: Ahtanum Creek Threshold Legal Issues (2003) (CP at 942-72); Memorandum Opinion La Salle High School Subbasin No. 23 (Ahtanum) (2006) (CP at 932-39); Supplemental Report of the Court Concerning the Water Rights for Subbasin No. 23 (2008) (CP at 722-931 (Part I) and CP at 539-721 (Part II)); Order Ruling on Certain Exceptions to the Supplemental Report of the Court/Proposed Conditional Final Order (2008) (CP at 532-38); and Memorandum

## THE PARTIES

We believe it is helpful at the outset to identify the various parties involved in this proceeding and briefly summarize their interests.

### 1. *The United States*

The United States acts as trustee for the Nation's federal reserved water rights. Federal reserved water rights are those rights impliedly reserved in the agreement between an Indian nation and the United States government creating an Indian reservation. Also called *Winters* rights after the case that first recognized them, such rights presume that when a reservation was established by treaty, sufficient water was reserved to meet the present and future needs of the reservation. *See Winters v. United States*, 207 U.S. 564, 28 S. Ct. 207, 52 L. Ed. 340 (1908); *Acquavella* II, 121 Wn.2d at 274. These rights are federal common-law-based rights, as opposed to rights that are subject to state water code regulation. *See Acquavella* II, 121 Wn.2d at 265-66.

### 2. *The Nation*

Although the United States acts as trustee for the Nation's water rights, the Nation joins this litigation in its own right. In 1855, 14 confederated tribes and bands in the Yakima Valley signed a treaty with the United States, establishing the Yakama Indian Reservation and becoming the Yakama Indian Nation. *Id.* at 266.

Opinion Exceptions to the Supplemental Report of the Court and Proposed Conditional Final Order Subbasin No. 23 (Ahtanum) (2009) (CP at 456-531). The Conditional Final Order Subbasin No. 23 (Ahtanum) (2009) is at CP 114-16, with the schedule of water right appearing at CP at 117-23. An Order on Motions for Reconsideration to the Memorandum Opinion and Conditional Final Order Subbasin No. 23 (Ahtanum) (2009) (CP at 74-80) completes the trial court's pertinent rulings.

In addition to its treaty-reserved rights for sufficient water to meet the present and future needs of its reservation, the Nation also has a right that dates from time immemorial to adequate water to sustain fish and other aquatic life in Ahtanum Creek.

### 3. DOE

DOE is the state agency charged with administering state water law. It was also, as noted, the party that initiated this action in an effort to determine the relative rights and priorities of the thousands of water-rights holders in the Yakima River Basin. DOE challenges, in part, a specific ruling of the trial court concerning the individual claimant, Clifford and Doris Hagemeier.

### 4. Department of Natural Resources (DNR)

DNR manages 25,640 acres of state trust lands for the support of common schools within the Ahtanum Creek Subbasin. These lands have been mostly used for grazing of livestock. Br. of Def./Resp't Wash. State Dep't of Nat'l Resources (Br. of DNR) at 1-2.

### 5. John Cox Ditch Company

John Cox is a private corporation formed in the late-1880s. CP at 1252-53. It diverts water from Ahtanum Creek and delivers it to nonriparian land (nonadjacent land) on the north side of the creek (near Tampico, Washington) for irrigation of orchards, hay, and grain, as well as for stock and domestic purposes. *Id.*

### 6. Ahtanum Irrigation District (or AID)

AID also delivers water to users on the north side of the creek. AID owns no canals, diversions works, or distribution systems. "Rather, the creek channel is the conveyance work and the individual right holders divert water from the creek." CP at 1013. For this reason, the trial court determined that in order for it to establish AID's rights, it was required to determine the rights of the individuals who make up AID. *Id.* AID therefore brings challenges that are relevant to its membership as a whole but also raises discrete issues pertaining to individual landowners, namely, Hull Ranches, the Chancery, and parcels of land owned by Claudia Richardson, Benn and Carol Splawn, and David and Christine Lynde. *See* CP at 897. AID also represents the interests of the Hagemeiers in this matter.

### 7. La Salle High School, Donald and Sylvia Brule, Jerome Durnil, and Albert Lantrip

These appellants are individual landowners. While their claims are not necessarily aligned, neither are they in conflict with one another.

John Cox, AID, and La Salle et al. are collectively referred to as "the Northside parties/users" in much of the briefing, as their parcels are on the north side of Ahtanum Creek. This opinion adopts that nomenclature when referring collectively to the nontribal parties. Having set forth the various parties involved here, we will now summarize the operative legal decisions preceding this adjudication.

LEGAL HISTORY OF AHTANUM CREEK SUBBASIN

Synthesizing the various decisions adjudicating and apportioning the rights to Ahtanum Creek waters is no small task. Relevant precedent includes agreements between the United States and the Nation, several decisions from this court, and decisions from the federal courts.

*1. 1855 Treaty*

On June 9, 1855, the Nation signed a treaty with the United States, creating the Yakama Reservation. CP at 1013. As we recognized in *Aquavella* II:

> During the last half of the 19th century, settlement of the West was encouraged as part of this country's policy of "Manifest Destiny". The need to resolve conflicts between the effects of this westward expansion and the Indians' traditional way of life often resulted in treaties establishing reservations. In reality the Indians had little choice but to sign the treaties, giving up land in exchange for money.

121 Wn.2d at 266. As explained above, the *Winters* doctrine instructs that a treaty creating a reservation carries an implied right to water sufficient to meet the present and future needs of the reservation. *Id.* at 274. The purpose of the Yakama Reservation has been recognized as agriculture-based activities and fishing. *Id.*

*2. 1908 Code Agreement*

By 1908, the United States government had embarked on a serious effort to establish irrigation systems for arid lands in 17 western states. The secretary of the interior was directed to build and operate dams, reservoirs, and canals in order to achieve this goal. *Id.* at 267. In 1905, the United States began withdrawing water from the Yakima River. *Id.* It soon became clear, however, that the river was

overappropriated and the reclamation effort was compromised. The United States introduced several programs in order to limit the draw from the river by individual users, but these were not as successful as hoped. *Id.* at 267-68. In 1908, the chief engineer of irrigation for the Bureau of Indian Affairs, W.H. Code, entered into an agreement on behalf of the Nation with the United States secretary of the interior. The so-called "Code Agreement" apportioned the waters of Ahtanum Creek so that the Nation received 25 percent of the natural flow and the Northside users received 75 percent. CP at 1014.

### 3. *1926* State v. Achepohl *decision (affirming the "Achepohl Decree")*

In the mid-1920s, the Yakima Superior Court oversaw an adjudication of the rights of water users situated north of Ahtanum Creek. CP at 1014. "Signatories and non-signatories to the 1908 Code Agreement were divided into 31 separate priority classes based on a 'first in time, first in right' analysis." *Id.* The superior court entered a decree quantifying their rights, the so-called "Achepohl Decree." *Id.* The Achepohl Decree was affirmed by this court. *State v. Achepohl*, 139 Wash. 84, 101, 245 P. 758 (1926). Certificates were issued showing the measure of each individual water right confirmed in the proceeding; these are referred to by the parties here as "Achepohl Certificates." According to AID, the Achepohl Decree is still used to apportion the 75 percent flow from Ahtanum Creek among the Northside users. CP at 1014. The Nation was not a party at any stage of the Achepohl proceeding. Yakama Indian Nation (YIN) Ex. 323.

## 4. Federal Cases

### a. *United States v. Ahtanum Irrigation Dist.*, 236 F.2d 321 (9th Cir. 1956) (*Ahtanum* I)

In 1947, the United States on behalf of the Nation filed an action in the United States District Court for the Eastern District of Washington seeking to invalidate the Code Agreement. CP at 1015. The trial court dismissed the complaint. On appeal, the United States Court of Appeals for the Ninth Circuit reversed the trial court's dismissal of the complaint but ultimately held that the Code Agreement was valid. *Ahtanum* I, 236 F.2d at 338, 342. The *Ahtanum* I court recognized that the Nation had *Winters* rights by virtue of the 1855 treaty creating the Yakama Reservation. *Id.* at 325. It thus questioned whether the Code Agreement's 25 percent allotment ran counter to the Nation's *Winters* rights. *Id.* at 326. And, it was conceded that the needs of the reservation required substantially the whole flow of the stream. *Id.* at 325. The *Ahtanum* I court explained that the Achepohl Decree had no effect on the Nation's reserved water rights. "It is too clear to require exposition that the state water right decree could have no effect upon the rights of the United States. Rights reserved by treaties such as this are not subject to appropriation under state law, nor has the state power to dispose of them." *Id.* at 328. Ultimately, though, it refused to invalidate the Code Agreement.

> But we are constrained to hold that since some arrangement for the apportionment of the Ahtanum waters was the sort of thing which the Secretary was authorized to do by the grant of general powers of supervision and management, he therefore had the power to make the 1908

> agreement. The Secretary's mistakes, his poor judgment, his overlooking or ignoring of the true measure of the Indians' rights, his lack of bargaining skill or determination may add up to an abuse of his power, but do not [negate] it, or make his act ultra vires.

*Id.* at 338. The *Ahtanum* I court reasoned that but for the Code Agreement, Northside users would have no right under state law to apportion any part of the Ahtanum Creek flow, "except in strict subordination of the prior and better rights of the United States as trustee for the Indians." *Id.* at 340. It thus held that the Northside users' 75 percent interest in the creek was limited by their needs as of 1908, and everything "not clearly shown to have been granted" to the Northside users "must be construed as reserving to the Indians." *Id.* at 341. Accordingly, the Ninth Circuit remanded the case to the trial court to determine the extent of the rights of the parties with respect to the waters of the stream. *Id.* at 339, 341-42. In doing so, however, it noted that the United States had shown and proved the quantities of water required by the reservation lands. *Id.* at 340.

> b. *United States v. Ahtanum Irrigation Dist.*, 330 F.2d 897 (9th Cir. 1964) (*Ahtanum* II or "Pope Decree")

Following the remand of *Ahtanum* I, the District Court for the Eastern District of Washington entered findings and conclusions of law based on a special master's report. *Ahtanum* II, 330 F.2d at 902. The United States again appealed the trial court determination. It complained that the special master and the trial court had not followed the instructions of the *Ahtanum* I court to determine the individual rights of Northside users but had instead conducted an "'in gross'" or "'aggregate'" determination. *Id.* at 910. Judge Walter L. Pope, writing for the

*Ahtanum* II court, acknowledged that it would have been a correct reading of the earlier opinion in *Ahtanum* I if the trial court had determined each Northside users individual right. *Id.* at 911. But the *Ahtanum* II court observed that there were considerations that warranted the district court's decision not to extend its decree so far. For example, the court explained that Washington's water code put the state in a better position than a federal court to manage the distribution and control functions of water rights. *Id.* at 911-12. But even though the *Ahtanum* II court appeared to appreciate the trial court's exercise of discretion in not individually adjudicating the water rights of Northside users despite what *Ahtanum* I seemed to require, the *Ahtanum* II court in fact found that the record before it was sufficient to order, adjudge, and decree a division of the waters of Ahtanum Creek. *Id.* at 914-15. It thus awarded to the parties, from the beginning of the irrigation season through July 10 of each year, the following:

> a. To defendants, for use of their lands north of Ahtanum Creek, seventy-five per cent of the natural flow of Ahtanum Creek, as measured at the north and south gauging stations, provided that the total diversion for this purpose shall not exceed 46.96 cubic feet per second, and provided that when the said measured flow exceeds 62.59 cubic feet per second defendants shall have no right to the excess, except in subordination to the higher rights of the plaintiff.[5]
> b. To plaintiff, for use of Indian Reservation lands south of Ahtanum Creek, twenty-five per cent of the natural flow of Ahtanum Creek, as measured at the north and south gauging stations; provided that when that natural flow as so measured exceeds 62.59 cubic feet per second, all the excess over that figure is awarded to plaintiff, to the extent that the said water can be put to a beneficial use.

---

[5] "A cubic foot per second (cfs) is a quantity of 1 cubic foot or 7.48 gallons, passing a given point in 1 second. An acre foot (af) is 1 foot in depth covering an acre, or 43,560 cubic feet, or 325,851 gallons. One million gallons per day equals 3.07 acre feet." *Acquavella* II, 121 Wn.2d at 263 n.5.

c. Plaintiff may divert such water from the south fork of Ahtanum Creek as can be beneficially used for the individual diversion into the Yak[a]ma Indian Reservation lying above the main Bureau of Indian Affairs diversion; provided, however, that the water diverted to such individual diversion shall be charged against and deducted from the overall award set forth in 'b' above.

d. To the plaintiff, for the lower Bureau of Indian Affairs diversion, a daily diversion of water representing five per cent of the natural flow of Ahtanum Creek as measured at the north and south fork gauging stations. This award shall represent plaintiff's interest in the return flow of the main stem of Ahtanum Creek, and the award to defendants shall be conditioned upon plaintiff receiving this flow of water at the lower Bureau of Indian Affairs diversion.

e. To defendants, all the rest of the return flow in the main stem of Ahtanum Creek, and all the return flow in Hatton and Ba[]chelor Creeks.

f. Any water loss which may occur between the north and south fork gauging stations, and the defendants' Hatton Creek diversion, is to be absorbed by defendants; plaintiff being entitled to its full stated percentage of the measured flow, and defendants taking the balance.

*Ahtanum* II, 330 F.2d at 915. In addition, the *Ahtanum* II court decreed that after July 10 of each year, "all the waters of Ahtanum Creek shall be available to, and subject to diversion by, the plaintiff for use on Indian Reservation lands south of Ahtanum Creek, to the extent that the said water can be put to a beneficial use." *Id.* Finally, the *Ahtanum* II court "reserve[d] jurisdiction to make such further orders as may be necessary to preserve and protect the rights herein declared and established, should a subsequent change in the situation or condition of the parties hereto so require." *Id.* at 915. This award is referred to by the parties as the "Pope Decree."

### 5. Acquavella *in the State Appellate Courts*

As noted, the ongoing adjudication of the Yakima River Basin has previously brought the *Acquavella* case to the Court of Appeals and to this court. In *Acquavella* I, we considered whether adequate notice of the *Acquavella*

summons was given by DOE and held that it was. 100 Wn.2d at 659. In *Acquavella* II, we considered several questions pertinent to the rights of the Nation. 121 Wn.2d at 272-73 (summarizing the issues before the court).[6] In *Department of Ecology v. Acquavella*, 131 Wn.2d 746, 935 P.2d 595 (1997) (*Acquavella* III), we considered a challenge to the trial court's award to the Yakima-Tieton Irrigation District, which is not a party in this proceeding. *Id.* at 750. Finally, in *Department of Ecology v. Acquavella*, 112 Wn. App. 729, 51 P.3d 800 (2002) (*Acquavella* IV), Division Three of the Court of Appeals affirmed the trial court's ruling that a decree from a different adjudication, declaring various water rights in a tributary to the Yakima River (the Teanaway River), meant the doctrine of res judicata barred a claimant from relitigating those rights in the *Acquavella* proceeding. *Id.* at 732.

## CONTENTIONS OF THE PARTIES ON APPEAL

Relevant to the parties' arguments is a preliminary discussion of the "practicably irrigable acreage" (PIA) standard. The PIA standard is a measure of the quantity of water available to irrigate a reservation and "calculates the amount of water sufficient to irrigate all the practicably irrigable acreage on a reservation." Corrected Br. of Appellant The United States (Br. of United States) at 8 (citing *Arizona v. California*, 373 U.S. 546, 600, 83 S. Ct. 1468, 10 L. Ed. 2d 542 (1963) (*Arizona* I), *overruled on other grounds by California v. United States*, 438 U.S. 645, 98 S. Ct. 2985, 57 L. Ed. 2d 1018 (1978)). PIA thus does not measure merely

---

[6] No party has argued that *Acquavella* II has any preclusive or controlling effect here.

how much land has historically been irrigated, or what is presently being irrigated, but how much land is and could feasibly be irrigated in the future. *See Arizona I*, 373 U.S. at 600.[7]

Below, the trial court concluded in 1994 that the decisions in *Ahtanum* I and II quantified the acreage that can be irrigated on the Yakama Reservation and that "the doctrine of res judicata applies to prevent relitigation of the already judicially determined irrigable acreage." CP at 1503. The trial court later noted, however, that "PIA, in its traditional sense, was found not to apply to Ahtanum Creek," CP at 1018, acknowledging that *Ahtanum* did not expressly discuss the PIA standard. But, wrote the trial court in its 1994 memorandum opinion regarding the PIA standard, it was clear from the Pope Decree that the federal court was making provision for the future needs of the Nation. CP at 1508-12. Ultimately, the trial court looked to the record established in *Ahtanum* I and II to determine that the reservation's practicably irrigable acreage is 4,107.61 acres. We turn now to the parties' specific arguments.

### 1. The United States/The Nation

The United States maintains that the trial court erred when it concluded quantification of the Nation's water right was litigated in the *Ahtanum* decisions. It argues that the *Ahtanum* court did not rely on the PIA standard. The United States asks that this court remand the case to the trial court for a determination

---

[7] In *Acquavella* II, we opined that the future of the PIA standard was uncertain. 121 Wn.2d at 275. To date, it is still the standard by which reservation irrigation water rights are measured.

under the practicably irrigable acreage evidence offered by the United States, which puts the total at 6,381.3 acres. Br. of United States at 19-21. The United States also argues that the trial court erred when it limited the reservation's water use to the irrigation season from April 1 to October 1. *Id.* at 39. The United States contends that the Pope Decree allows it to exercise its treaty rights and divert water year-round. The United States also challenges the trial court's determination that the Pope Decree precludes the Nation from exercising a storage right, i.e., the right to keep diverted water in a storage facility on the reservation for future use. *Id.*

In addition, the United States argues that the trial court improperly included, in its confirmation of the United States' right, a number of non-Indian successors to what was once tribal land. The United States contends that it does not hold water rights in trust for such individuals and asks this court to direct the trial court to revise the United States' claim accordingly. Br. of United States at 44.

Finally, the United States challenges that the trial court's description of its irrigation right as shared with Northside users between April 1 and April 15 as erroneous. In fact, argues the United States, other than John Cox, no Northsider users' irrigation season begins before April 15. Thus, the United States argues that between April 1 and April 14, it is entitled to all the flow from the creek available for irrigation, except for the John Cox share.

The Nation joins in all of these arguments. In addition, it argues that this court should reverse the trial court's ruling that Northside users who had rights confirmed in the Pope Decree may take, when available, any excess water beyond

that to which the Nation is entitled. The Nation argues that excess water does not exist as a matter of law. Yakama Nation Br. at 47. The Nation also argues that the trial court erred when it ruled that Northside parties have a priority date for nondiversionary stockwater rights senior to the Nation's treaty irrigation rights, absent proof of that priority date. The Nation asks this court to reverse that determination and remand for an evidentiary hearing on the priority date of that right.

### 2. DOE

DOE cross-appeals on the issue of whether the trial court correctly interpreted RCW 90.14.140(2)(c). The trial court relied on the statute to confirm the water right of an individual user, the Hagemeiers. After five years of consecutive nonuse of a water right, relinquishment follows unless an excuse for nonuse under RCW 90.14.140(2) applies. DOE argues that the excuse upon which the Hagemeiers relied under the statute is not supported by evidence in the record. It asks for reversal on this issue. DOE also challenges AID's standing to litigate this claim on behalf of the Hagemeiers. Resp't/Cross-Appellant State of Wash., Dep't of Ecology's Reply Br. (DOE Reply Br.) at 9.

In addition, DOE responds to the arguments of the appellants. DOE agrees with the United States and the Nation that the trial court should have used the practicably irrigable acreage standard, rather than relying on the federal *Ahtanum* litigation, to quantify the reservation's irrigation right, and that the trial court erred in holding there was no right to store water, no right to take water outside the

irrigation season, and no exclusive right (save John Cox's right) to the water between April 1 and April 14 of each year. DOE further agrees that the trial court confirmed stockwater rights for off-reservation users without sufficient evidence showing those rights carry a priority date senior to that of the 1855 treaty.

However, DOE also agrees with the Northside users that excess water—that is, water not put to beneficial use by the Nation—should be available for allocation under state water law to Northside users.

### 3. DNR

DNR files briefing on the only issue involving it: whether the trial court erred in confirming a nondiversionary stockwater right for DNR with a priority date senior to the Nation's treaty irrigation rights. "DNR concedes that this priority date does not reflect the evidence in the record concerning DNR's acquisition and use of its lands." Br. of DNR at 4. It asks this court to remand to the trial court for entry of findings of fact on this issue.

### 4. John Cox

In proceedings below, John Cox urged the trial court to confirm "junior" water rights. Generally, a "junior water right" is a later-appropriated right with a later priority date than a "senior" water right. *See* Br. of the United States as Cross-Resp't to Brs. of Appellants John Cox Ditch Co., Ahtanum Irrigation Dist., and La Salle, et al. (Resp. Br. of United States) at 4. Here, however, John Cox

uses the term "junior right" to mean a right to irrigate lands not recognized in the Pope Decree.[8] The trial court refused to recognize such right. CP at 457.

John Cox also asked the trial court to recognize a right to "excess water." As John Cox formulates it, excess water is water beyond that needed to satisfy all confirmed water rights on and off the reservation and needed to satisfy minimum instream flow to support fish and aquatic life in the creek. *See* Br. of John Cox at 8.

John Cox asked the trial court to confirm a right to excess water for two groups or classes: (1) claimants (such as John Cox) who were parties to the Code Agreement and the Achepohl Decree, but who, by virtue of the right confirmed to them in the Pope Decree, are receiving less than allocated to them under the Achepohl Decree and (2) claimants who were denied a right under the Pope Decree to participate in the Code Agreement allocation. *Id.* at 21-22.

The trial court in an initial ruling agreed with John Cox that excess water was available for both classes of claimants. CP at 1087-88. However, the court later amended its decision and ruled that when excess water exists, it "can only be used on lands for which rights were recognized in the Pope Decree and, therefore, cannot be used as 'junior rights.'" CP at 457-58.

John Cox challenges this determination. The trial court erred, John Cox argues, because it mistakenly viewed *Ahtanum* I and II to have been a de facto

---

[8] An appendix to *Ahtanum* II listed all the lands with a right confirmed by the Pope Decree.

adjudication of individual Northside user water rights, whereas those cases were merely an allocation of water between the reservation and all Northside users. John Cox contends that the *Ahtanum* cases trigger neither res judicata nor collateral estoppel on this issue. Moreover, John Cox believes the trial court's ruling ignores state-based rights under the Achepohl Decree.

In addition, John Cox asks this court to reverse the trial court's determination that it was not entitled to a post-July 10 water right, outside the irrigation season. John Cox asks that a post-July 10 right to excess water be confirmed, subordinate only to the Nation's rights.

Finally, John Cox challenges a limitation placed by the trial court on John Cox's "excess water" right award.

### 5. *AID*

AID joins John Cox in arguing that the trial court erred in its determination involving a "junior right" to "excess water." The use of excess water, argues AID, must be governed by state law under the provisions of the Achepohl Decree. AID faults the trial court for failing to recognize that nothing in *Ahtanum* I or II should or can be read to conflict with the Achepohl Decree. *See* Br. of Appellant Ahtanum Irrigation District (Br. of AID) at 21-27. AID believes the same argument should have led the trial court to allow a post-July 10 right to "excess water" and joins John Cox in challenging this ruling.

In addition, AID advances several arguments on behalf of individual parties who were denied claims. In order to have a water right confirmed in this

adjudication, the trial court required every Northside claimant to show that (1) the water was beneficially applied to the land, (2) a predecessor on the land signed the Code Agreement, (3) the property also received an Achepohl Certificate, and (4) the property in question was included in an answer filed in the federal *Ahtanum* litigation. CP at 934.

With regard to the property owned by Hull Ranches, AID claims that a mistake was made by the *Ahtanum* II court when it found that the owner of the property did not sign the Code Agreement, and the trial court below should not have relied on that finding. With regard to the parcels owned by the Chancery and the Richardsons, Splawns, and Lyndes, AID asks this court to remand those determinations back to the trial court, which AID contends made a clerical error in failing to include these parcels and owners in its confirmation of rights.

Finally, AID responds on behalf of the Hagemeiers to DOE's challenge regarding application of the statutorily prescribed excuse for nonuse of a water right.

### 6. *La Salle High School, Donald and Sylvia Brule, Jerome Durnil, and Albert Lantrip*

As noted, in order to have a water right confirmed in this adjudication, the trial court required that the property in question have been included in an answer filed in the federal *Ahtanum* litigation. CP at 934. The trial court concluded that neither the Brules nor La Salle made a showing of the fourth prong: that their properties were included in an answer filed in the federal *Ahtanum* litigation, the

suit for which was filed in 1947. CP at 933, 495-96. The Brules argue that their predecessor in interest in 1947, Walter Cope, was never served in the federal litigation or, if he was, none of his successors were ever substituted into the litigation after the land was transferred. Thus, the Brules contend that *Ahtanum* I and II can have no preclusive effect because there is no identity of parties. As to La Salle, it is not contested that the owner of the land in 1947, Jeannie Goodman, was served with the *Ahtanum* suit. But she died a year later. Corrected Br. of Appellants La Salle High School, Donald and Sylvia Brule, Jerome Durnil, and Albert Lantrip (Br. of La Salle) at 16. La Salle now claims that Goodman's successors were required to be substituted into the litigation under Federal Rule of Civil Procedure (FRCP) 25(a)(1). Thus, La Salle argues that the record does not establish its predecessors were "properly served with paperwork that would have put them on notice that they were parties to the Federal *Ahtanum* Litigation" and that case can have no preclusive effect. Br. of La Salle at 20-21.

In addition, these appellants join John Cox in arguing that the *Ahtanum* cases were not a general adjudication of water rights to the creek. *Id.* at 21. Thus, argues La Salle, the trial court erred when it required Northside users to prove their property was included in an answer filed in *Ahtanum* II. Br. of La Salle at 22. In the alternative, these appellants also join John Cox and AID in arguing that the trial court erred when it denied "junior rights" to "excess water." They ask that if this court affirms the trial court's denial of a "senior" (i.e., primary) water right, the

court reverse the trial court's determination that excess water cannot be used by non-*Ahtanum* parties.

## SUMMARY OF ISSUES AND SHORT ANSWERS

As noted *supra* note 1, some of the issues brought to us by the parties were uncontested at the close of briefing, and as to those issues, we remand to the trial court for proceedings consistent with the parties' concessions. The live issues in this appeal that remain are as follows.

1. Was the federal litigation an adjudication of Northside users' rights? [Short Answer: Yes.]

2. Did the federal *Ahtanum* litigation quantify the reservation's irrigable acreage? [Short Answer: No. Remand for a determination of acreage.]

3. Storage right

    a. Did the trial court correctly characterize the reservation's claim for a storage right from April to October as premature? [Short Answer: No. Remand for further fact-finding as to the necessity of storage.]

    b. Did the trial court properly deny the reservation a storage right from October to April? [Short Answer: No. Reverse and remand to determine limit of right.]

4. Excess water

    a. Did the trial court properly conclude that, as a matter of law, excess water is available for qualifying Northside users? [Short Answer: Yes.]

b. Did the trial court properly deny qualifying Northside users a right to use excess water after July 10? [Short Answer: Yes.]

c. Did the trial court properly limit John Cox's interest in excess water to a 45-day period of use ending May 15? [Short Answer: Yes.]

d. Did the trial court properly deny a "junior right" to "excess water" for lands not recognized in the Pope Decree? [Short Answer: Yes.]

5. Individual denials based on failure to satisfy the trial court's four-part test

a. The Brules: Did the trial court properly determine that the Brules' predecessor in interest, W.C. Cope, was served in the federal *Ahtanum* litigation? [Short Answer: Yes.]

b. La Salle High School: Did the trial court properly determine that La Salle's predecessors in interest were served in the federal *Ahtanum* litigation? [Short Answer: Yes.]

c. Hull Ranches: Did the trial court properly deny Hull Ranches a water right on the basis that the *Ahtanum* II court found the Hull Ranches' predecessor in interest did not sign the Code Agreement? [Short Answer: Yes.]

6. Did the trial court properly apply the future development excuse in RCW 90.14.140(2)(c) to the Hagemeiers? [Short Answer: No.]

7. May this court direct the trial court to correct a clerical error? [Short Answer: Yes. Remand as to the Chancery parcel to correct any error; affirm as to the Splawn, Richardson, and Lynde parcels.]

ANALYSIS

There are several discrete and unrelated issues presented in this appeal. But in general, they fall into the following categories: claims dealing with quantification of the reservation's acreage, claims dealing with the reservation's right to store water, claims concerning the availability or existence of excess water, and claims of error on the part of the trial court that are specific to individual claimants.

Although these issues are for the most part unrelated in fact, all require us to decide what the federal *Ahtanum* litigation accomplished. Disagreement between the appellants and the Northside parties as to the correct reading of *Ahtanum* informs most of their positions. The main area of disagreement is whether the federal *Ahtanum* cases constituted merely an allocation of water rights as between the reservation and the Northside users or an adjudication of Northside users' water rights. The trial court repeatedly held that it was an adjudication. *See, e.g.,* CP at 750 (Suppl. Report of the Court (Suppl. Report) at 26). The Northside users argue it was merely an allotment or an in gross apportionment. Because the answer to this question guides several of our holdings, this opinion will turn to that question first.

1. The federal *Ahtanum* litigation was an adjudication of Northside users' rights

As explained, in order to have a water right confirmed in this adjudication, the trial court required every Northside claimant to show that (1) the water was

beneficially applied to the land, (2) a predecessor on the land signed the Code Agreement, (3) the property also received an Achepohl Certificate, and (4) the property in question was included in an answer filed in the federal *Ahtanum* litigation. CP at 934 (Mem. Op. La Salle High School (Mem. Op. re La Salle) at 3). The trial court ruled that various parties failed to show one or more of these prerequisites, and those parties were thus denied water rights.

These parties now argue that the trial court erred as a matter of law in holding that the federal *Ahtanum* litigation had preclusive effect on Northside users' rights. *See* Br. of John Cox at 9; Br. of La Salle at 21. The parties assert that *Ahtanum* was not a general adjudication of Northside users' water rights, but merely an allocation of water as between the reservation and the Northside users. *See* Br. of La Salle at 21-26.

The federal *Ahtanum* litigation did adjudicate the Northside users' water rights. The Northside users are correct that when *Ahtanum* was initially filed, the United States did not seek a general adjudication but instead sought to invalidate the Code Agreement. But the Ninth Circuit Court of Appeals admonished the federal district court for dismissing the United States' complaint on the basis that the United States had failed to prove it had any right, as a trustee, to the waters of Ahtanum Creek. *Ahtanum I*, 236 F.2d at 339. The *Ahtanum I* court explained that the trial court missed the point. "[A] determination of the validity of the 1908 agreement did not call for the trial court's conclusion that the United States had no interest whatever in the Ahtanum waters." *Id.* Instead, the *Ahtanum I* court

explained that, "as in the case of other suits to quiet title, the defendants should have been required to appear by answer and set forth their claims of right to the use of the waters of the stream." *Id.* It went on to direct that:

> Since the cause must be remanded for further proceedings in the trial court, *and since those proceedings must determine and adjudicate the respective rights of the parties*, during which defendants must be required to show and disclose their rights and titles, it is apparent that proper and appropriate answers must be required from all defendants.

*Id.* (emphasis added). Despite this direction, on remand the federal district court again failed to adjudicate individual claims. The *Ahtanum* II court excused this exercise of discretion, *but it did not adopt it*. 330 F.2d at 910-12. Instead, the Ninth Circuit Court of Appeals explained that the record created at trial allowed it to fully adjudicate the relative rights of the parties, and it did so.

> The conclusions which we have reached here are such that a new trial of the case is unnecessary. A retrial would be most unfortunate. The parties should be informed now as to where they stand, and the unanimity of the evidence, to which we have previously alluded, makes our conclusion as to the extent of the 1908 water rights possible on this record.

*Id.* at 914. The *Ahtanum* II court then made parcel-by-parcel adjustments to the irrigated acreage figures presented to the federal district court, as reflected in appendix A and appendix B of the court's opinion. *Id.* at 916, 917.

Further evidence that the federal *Ahtanum* litigation ultimately adjudicated individual rights lies in the Northside parties' petition for writ of certiorari following the *Ahtanum* I decision and the *Ahtanum* II court's characterization of it:

> It would appear that [. . .] the defendants were not in doubt that this court had previously ruled that they must prove their rights as of 1908 and establish their needs to the water as of that time. Thus, in their petition for certiorari following our former decision, defendants stated: "We thus find

the court upholding the agreement on the one hand and then requiring the water users on the north side to completely readjudicate their rights by requiring them to establish their needs as measured fifty years ago. * * * The Court of Appeals' decision states: 'Furthermore, as in the case of other suits to quiet title, the defendants should have been required to appear by answer and set forth their claims or right to the use of the waters of the stream.' The effect is to require the Ahtanum water users to adjudicate again their right to the use of waters from the stream. They are not only required to establish their needs as of 1908, which was one of the purposes of the 1908 agreement, but are again required to prove their water rights with the same particularity which was required of them in the state court proceeding in 1925."

Plainly with this correct understanding of the meaning of our mandate the defendants at the trial on the remand proceeded to prove, elaborately and with particularity, what their water rights, or the water rights of their predecessors, were in 1908.

*Ahtanum* II, 330 F.2d at 905.

We reject the Northside users' contention that the federal *Ahtanum* litigation was merely an in gross allocation and not a water rights adjudication. On this point, we affirm the trial court. Because we hold that the *Ahtanum* litigation was an adjudication of rights, the trial court here properly required parties to show they filed an answer in *Ahtanum* in order to have a right confirmed in this proceeding.

Keeping this overarching holding in mind, we turn now to the remaining arguments presented.

2. The *Ahtanum* litigation did not preclusively quantify the reservation's irrigable acreage

Although during the course of this proceeding the trial court issued a number of decisions quantifying the Nation's irrigable acreage, it did not make a definitive decision on this question until its 2009 memorandum opinion re Subbasin Number 23 exceptions (CP at 456-531). As described earlier, the trial court concluded that the federal *Ahtanum* litigation had preclusively quantified the amount of irrigable

acreage on the reservation. CP at 515. Based on quantifications made in a 1957 pretrial order on the merits in the *Ahtanum* cases, the trial court determined that the amount of practicably irrigable acreage is 4,107.61 acres. CP 514-15 (subtracting 992.39 acres of reservation land confirmed a separate right from the "approximately" 5,100 acres claimed by the United States in the *Ahtanum* cases).

The Nation and the United States argue that the federal *Ahtanum* litigation did not quantify the reservation's acreage at all. Given that they believe quantification is still an undetermined question, the United States and the Nation argue that the correct figure is 6,381.3 acres. Br. of United States at 21; Yakama Nation Br. at 13-18.[9]

Whether the trial court erred in giving *Ahtanum* preclusive effect on the question of the reservation's quantum of acreage is a question of law, and as such the standard of review is de novo. *Sunnyside Valley Irrigation Dist. v. Dickie*, 149 Wn.2d 873, 880, 73 P.3d 369 (2003).

As an initial matter, the trial court, in finding that *Ahtanum* preclusively determined the reservation's irrigable acreage, relied on agreed facts in a 1957 pretrial order in *Ahtanum*. "There is a second Order [the 1957 Order] that the Court believes establishes the law of the case regarding acreage." CP at 514. The trial court *did not* ultimately rely on an earlier 1951 pretrial order that also

---

[9] The United States and the Nation offered alternative arguments on the question of quantifying acreage in the event we concluded the federal *Ahtanum* litigation had some preclusive effect on the question. Because we hold that it does not, we do not consider the alternative arguments.

contained references to a number of different acreage quantifications. *See* CP at 513-14 (discussing but not relying upon 1951 pretrial order). It is important to point this out because some of the parties spend a fair amount of time discussing the 1951 pretrial order. *See, e.g.*, Yakama Nation Br. at 26; Resp. Br. of Appellant/Resp't John Cox Ditch Co. to Brs. of the United States, Yakama Nation and Washington State Department of Ecology (Resp. Br. of John Cox) at 15-16; Resp. Br. of Appellant/Cross Resp't Ahtanum Irrigation Dist. to the United States and Yakama Nation, Br. of Appellant (Resp. Br. of AID) at 9-10. The trial court did appear to rely upon the 1951 pretrial order in early rulings. *See* CP at 923. And it also cited to the 1951 pretrial order to establish the quantity of non-Indian fee lands. CP at 515. But in the final analysis, as noted, the 1951 pretrial order was not part of the trial court's mathematical calculation as to the reservation's irrigable acreage. *Id.*

In finding that the 1957 pretrial order controlled, the trial court looked to agreed fact XV, which stipulated that irrigable lands claimed by the reservation totaled "approximately 5,100 acres." CP at 514. The trial court found the 5,100 figure to be reasonable based on other contentions put forth by the United States in the 1957 pretrial order. CP 515. It then subtracted from 5,100 the 992.39 acres of non-Indian reservation fee land to arrive at an irrigation right for the Nation of 4,107.61 acres.

The United States correctly identifies the error in the trial court's reasoning. Br. of United States at 25. The 1957 pretrial order did not contain a stipulation

from the parties that the irrigable land on the reservation in fact totaled 5,100. Instead, the agreed fact was merely that the United States *claimed approximately* 5,100 acres of irrigable land. CP at 514. It is not at all clear how an approximated figure could serve as the basis by which to quantify the reservation's irrigation right. Moreover, this agreed fact came under the heading "Lands For Which Rights To The Use of Water from Ahtanum Creek Are Claimed." CP at 3684 (1957 pretrial order at 6). Thus, the 5,100 acre calculation is not a figure the federal district court in *Ahtanum* arrived at as a finding of fact.

Neither does the 1951 pretrial order alone provide a sufficient basis to support the trial court's determination that *Ahtanum* preclusively quantified the reservation's irrigable land. As the trial court itself noted, the 1951 pretrial order contained two equally reasonable quantifications of the irrigation right. CP at 923. More importantly, the 1951 pretrial order was part of a proceeding brought by the United States to invalidate the Code Agreement. The district court held that the United States had not proved that it "had any right, title or interest in any water of Ahtanum Creek" and dismissed the action and the complaint. *Ahtanum* I, 236 F.2d at 323-24. It would be a dubious conclusion to say that the United States' evidence of irrigable acreage incorporated into the 1951 pretrial order made a preclusive quantification of the reservation's irrigable acreage when the proceeding under which the order was entered ultimately found the United States had no interest whatsoever in the water.

AID and John Cox rely on and quote extensively from the 1957 pretrial order, and the trial court's discussion of the order, in arguing that *Ahtanum* is preclusive. Resp. Br. of AID at 7-19; *see generally* Resp. Br. of John Cox. But they offer no response to the persuasive contention that an approximate claim, as the 5,100 acre figure was, is not a finding of fact.

The best argument AID and John Cox have that the federal *Ahtanum* litigation determined the reservation's irrigable acreage can be found in language from *Ahtanum* I. Describing the proceeding below, the Ninth Circuit wrote:

> By maps and Indian Office records the United States showed the location, point of diversion and capacity of each ditch constructed by Indians, or by the Indian Service, and the description, irrigable area, and location of all reservation lands served by those ditches with water from Ahtanum Creek. Also shown are the rate of progress through the years since the creation of the treaty in getting this water upon these lands. Just which lands are Indian owned, whether under trust or fee patent, and which are owned by successors of Indian allottees, also was proven. *The quantities of water required by these lands was both stipulated and proven.*

236 F.3d at 340 (emphasis added); Resp. Br. of John Cox at 14-15 (quoting Judge Stauffacher's citation to this language in his 1994 PIA memo). But to the extent this language hints that the United States may have proved an acreage quantification, it merely notes that the United States adequately proved what acreage it presently irrigated as of 1947, when the federal *Ahtanum* litigation commenced. This is not adequate to meet the practicably irrigable acreage standard, which must account for both present and future needs of the reservation. *Arizona* I, 373 U.S. at 600. Thus, it would be erroneous to hold that this language

intimates that the PIA quantification of the reservation's irrigation right was proved in the federal *Ahtanum* proceedings.

John Cox endorses the trial court's view that the federal *Ahtanum* litigation did make provision for the future needs of the reservation, and therefore preclusively determined the reservation's practicably irrigable acreage. Resp. Br. of John Cox at 11-13; CP at 1508-12. But the portions of *Ahtanum* I and II that the trial court and John Cox cite in support of this assertion discuss the ongoing *shortfall* the reservation would face as a result of the Code Agreement. The Pope Decree's allocation tried to minimize the negative impact of the Code Agreement while respecting the agreement's percentage allocation.

> The conclusions which we have reached here are such that a new trial of the case is unnecessary. . . . Thus the Indian Tribe may now ascertain, by actual experience under the decree, just how badly they have suffered through the Code taking of their property. Plainly the waters they are here awarded will be insufficient for the irrigable lands of the Reservation. Just how insufficient they can soon tell.

*Ahtanum* II , 330 F.2d at 914.

In sum, there were several figures quantifying (or approximating) the reservation's practicably irrigable acreage available from the record created in *Ahtanum*. Nowhere in the *Ahtanum* federal district court proceedings was there a finding of fact as to the reservation's practicably irrigable acreage. Hence, it is evident that proceeding did not quantify the acreage. The trial court erred when it declined to consider the United States' evidence of practicably irrigable acreage. Because the trial court made no findings of fact as to the practicably irrigable

acreage evidence the United States and the Nation offered, we are not in a position to adopt those parties' contention that the correct figure is 6,381.3 acres. The acreage remains to be determined. We hold that because the federal *Ahtanum* proceeding did not quantify the reservation's practicably irrigable acreage, the trial court should have considered the evidence as to practicably irrigable acreage. We remand for a determination consistent with this holding.

3. Storage right

The Pope Decree granted qualifying parties the right to divert water from Ahtanum Creek. The parties now debate whether the Nation is precluded under the Pope Decree from also storing water, such as in a reservoir or other storage facility. The following two questions relate to that claimed right.

a. The reservation's claim for a storage right from April to October is not premature

Notably, the trial court did not outright deny a storage right to the reservation, but rather held that it was premature to grant one. CP at 521. The trial court noted that it would include a statement in its conditional final order (CFO) "allowing for some modification of the Yakama Nation's water right" to account for storage in the future. *Id.* at 522. However, it failed to include the statement in the CFO.

The trial court offered little reasoning supporting its conclusion that confirmation of a storage right for the reservation would be premature as to a storage right between April 1 and October 1. It noted only that it was a "request

for a potential future storage right." CP at 521. The United States argues that it is not asking for a future storage right but instead asking to store water "it already has a right to divert for use on acres it already has a right to irrigate." Br. of United States at 41-42. John Cox argues that the United States failed to provide evidence that construction of a storage facility was economically feasible or that there was a suitable site on the reservation for such storage. Resp. Br. of John Cox at 28. The United States and DOE respond that economic feasibility is an appropriate question in making a determination of practicably irrigable acreage.

Because we have already concluded this case must be remanded to the trial court for a determination of the reservation's irrigable acreage under the practicably irrigable acreage standard, we have effectively mooted the question of whether a determination of the storage right is premature. We remand for fact finding from the trial court on the question of the reservation's storage needs as part of its practicably irrigable acreage determination and appropriate conclusions of law.

> b. The trial court erred when it denied the reservation a storage right from October to April

The Nation seeks a right to divert and store water from October to April. The trial court denied this claim because it held that *Ahtanum* I and II precluded such an award. Those cases, wrote the trial court, "authorize diversion of water between April 1 and October 1" and "do not provide for water to be diverted during the nonirrigation season." CP at 521.

By its plain language, the Pope Decree does not foreclose a storage right. It decrees that after July 10 of each year, "all the waters of Ahtanum Creek shall be available to, and subject to diversion by, the plaintiff for use on Indian Reservation lands south of Ahtanum Creek, to the extent that the said water can be put to a beneficial use." *Ahtanum* II, 330 F.2d at 915. We hold that the trial court erred in denying the reservation a right to store water outside the irrigation season. The extent of this storage right should be considered on remand as part of the trial court's practicably irrigable acreage determination.

4. Excess water

The trial court ruled that some Northside users could make use of "excess" water in Ahtanum Creek—that is, water "in excess of that needed to satisfy all confirmed water rights both on and off the reservation and any water needed to satisfy the Yakama Nation's minimum instream flow right for fish." CP at 753-54. But the trial court ordered that only lands that were recognized in the Pope Decree had a right to excess water, and it imposed additional limits. *Id.* at 753. These rulings are challenged by the parties. Yakama Nation Br. at 43; Br. of John Cox at 21; Br. of AID at 18; Br. of La Salle at 26-27. The following four questions relate to the parties' challenges.

a. The trial court properly concluded that as a matter of law, excess water is available for qualifying Northside parties

The Nation contends that as a matter of law, Northside parties should have no right to excess water. Yakama Nation Br. at 47. To be more precise, the Nation

argues that there is no excess water as a matter of law because the Nation's treaty-reserved rights mean that all water not specifically granted to the Northside parties reverts back to the reservation. *Id.* at 46-47. Moreover, there is insufficient water in the creek to satisfy even the needs of the reservation, so there is no basis to confirm an excess right for Northside parties. *Id.* at 47.

The Pope Decree altered the traditional scheme of treaty-reserved rights in that it granted excess water to the reservation *to the extent it can be put to beneficial use. See Ahtanum* II, 330 F.2d at 915; *see* Resp. Br. of United States at 4. As a matter of law, due to its treaty-based reserved rights, the Nation has no obligation to ensure there is excess water after the allotments under the Pope Decree are satisfied. But just because there may be no water available does not mean a right to excess water cannot be confirmed to qualifying Northside users.[10] *See United States v. Anderson*, 736 F.2d 1358, 1365 (9th Cir. 1984) (noting in the context of a question about the state's jurisdiction to regulate excess water impacting a treaty reservation that "[a]ny permits issued by the state would be limited to excess water. If those permits represent rights that may be empty, so be it."); CP at 754 (explaining that "it is an irony of stream adjudications that insufficient supply does not prevent a court from confirming rights, unless it can be demonstrated that such a limitation on supply has prevented beneficial use"); *see*

---

[10] A qualifying Northside party is one who meets the trial court's four part test: (1) the water was beneficially applied to the land, (2) a predecessor on the land signed the Code Agreement, (3) the property also received an Achepohl Certificate, and (4) the property in question was included in an answer filed in the federal *Ahtanum* litigation.

*also* Br. of AID at 28; Resp't/Cross-Appellant State of Wash., Dep't of Ecology's Opening/Resp. Br. (Br. of DOE) at 36. For this reason, the Nation's argument that rights should be denied because there will be some years when no excess water exists is not compelling. The qualifying Northside parties may hold the right regardless of whether it will be fulfilled.

We affirm, as a general proposition, the trial court's ruling granting qualifying Northside parties a right to use excess water. We adhere to the trial court's and the parties' conception of excess water: water in excess of that needed to satisfy all rights confirmed both on and off the reservation under the Pope Decree as it incorporated the Code Agreement and any water needed to satisfy the Nation's minimum instream flow right for fish. Moreover, we also adhere to the trial court's limitations on the use of excess water, as will be explained further below.

### b. The trial court properly denied qualifying Northside users a right to use excess water after July 10

The trial court denied qualifying Northside users the right to use excess water after July 10. CP at 955 (2003 Mem. re Legal Issues at 14-16). It noted that in outlining the parties' respective rights during the irrigation season from April to July, section I of the Pope Decree gave Northside parties no right to excess water "'except in subordination to the higher rights of the plaintiff.'" CP at 956 (quoting section I, paragraph a. of the Pope Decree). But the trial court further observed that section II of the Pope Decree, discussing rights after July 10, simply said that

-40-

all the waters of Ahtanum Creek shall are available to the Nation, to the extent that the water can be put to a beneficial use. *See* CP at 957 (discussing section II of the Pope Decree). The trial court noted that in contrast to section I, section II said nothing about the defendant's subordinate rights to excess water at all. The significance of this, the trial court concluded, was that the Pope Decree did not intend to award Northside parties any right to use excess water after July 10. We agree.

Lending support to the trial court's interpretation is the *Ahtanum* II court's observation that evidence showed there was historically no water available after the first of July each year. The Ninth Circuit said it was thus "compelled to hold that the water rights of the individual parties to the 1908 agreement . . . terminated in the early part of July in each year, a conclusion which must be reflected in the final judgment in this case." *Ahtanum* II, 330 F.2d at 910.

The Northside parties argue that section II of the Pope Decree, while it did not mention Northside users' rights to excess water, limited the reservation water right to beneficial use. Thus, they contend, any water after July 10 that is not beneficially used by the reservation is "excess water" that should be available for use by Northside parties. *See, e.g.*, Br. of John Cox at 25. While the Northside parties' argument is not untenable, they offer no grounds for reading *Ahtanum* II's statement that individual parties' rights terminate in the early part of July as anything other than unequivocally limiting Northside users' interest in excess

water beyond July 10.[11]  We hold that the trial court properly denied Northside users an interest in excess water after July 10.

> c. The trial court properly limited John Cox's interest in excess water to a 45-day period of use ending May 15

When excess water is available, the trial court awarded lands recognized in the Pope Decree additional water up to the 0.02 cfs per acre as authorized in the "appurtenant certificates."[12]  CP at 458 (2009 Mem. Op. to the 2008 Suppl. Report of the Court at 3).  In a later ruling, the court explained that

> [t]he Court determined that excess water would be available during the early spring. *Memorandum Opinion*, p. 3, lines 14 through p. 4, line 10. Although not specifically set forth, as can be seen by the confirmed water rights, the Court relied upon a 30 day availability for water users north of Ahtanum Creek.  For Johncox [sic], the Court relied upon 45 days, as Johncox's [sic] season begins on April 1, not April 15.

CP at 77 (2009 Order on Mots. for Recon. to the Mem. Op. and Conditional Final Order at 4).  Thus, the Northside users' right to use excess water is limited to a 30- or 45-day period terminating in May.

John Cox is the only party who appears to appeal this particular limitation on excess water use.  Br. of John Cox at 26-28; Reply Br. of Appellant/Cross-Resp't

---

[11] It is true that in Washington, "judicial and legislative developments have firmly established the preference for beneficial usage" of water rights. *In re Rights to Waters of Stranger Creek*, 77 Wn.2d 649, 656, 466 P.2d 508 (1970).  But if the Nation does not put water after July 10 to beneficial use, we presume it will flow down to users in a lower subbasin.  *See* Wash. Supreme Court oral argument, *Wash. Dep't of Ecology v. Acquavella*, No. 83788-1 (Sept. 18, 2012), at 17 min., 11 sec. through 17 min., 50 sec., *video recording by* TVW, Washington State's Public Affairs Network, *available at* http://www.tvw.org (counsel explaining that water moves in stream from one reclamation project to another).  The effect of *Ahtanum* II on this question does not disturb our jurisdiction's preference for beneficial use.

[12] "Appurtenant certificates" appears to mean the Achepohl Certificates in the context of the trial court's discussion.  CP at 458.

John Cox Ditch Co. to Resp. Brs. of the United States and Yakama Nation (Reply Br. of John Cox) at 23. John Cox does not appear to question as a matter of law the trial court's ability to place limits on John Cox's use of excess water. Instead, John Cox argues that the trial court's decision is not based on substantial evidence. Reply Br. of John Cox at 23-24. The United States explains how the trial court might have arrived at its 45-day limit on excess water use. Resp. Br. of United States at 30-32. It suggests the trial court might have relied on a declaration supplying evidence of flow data for 1998-2008, which could have led the trial court to conclude 45 days ending May 15 accounted for the period of time in which there was usually excess water. *Id.* (citing CP at 5-10). John Cox cites to its own exhibits, which it claims "show late May and early June are frequently the periods of highest flow in the Ahtanum subbasin." Reply Br. of John Cox at 24 (citing Ex. JCD (John Cox Ditch) 16 through Ex. JCD 30). However, the trial court recognized that "[t]he period of time each year that excess water might be available varies significantly." CP at 498.

"[W]here competing documentary evidence must be weighed and issues of credibility resolved, the substantial evidence standard is appropriate." *Dolan v. King County*, 172 Wn.2d 299, 310, 258 P.3d 20 (2011). We are not in a better position than the water adjudicator to evaluate complex scientific evidence regarding water availability in the Ahtanum Creek Subbasin. Thus, although there may be conflicting evidence, there is evidence of sufficient quantum to persuade a fair-minded person that the 45-day limitation ending on May 15 was reasonable.

John Cox is correct that the availability of water does not necessarily dictate a right, as we have already noted. But a limitation on the right still recognizes that the right exists. We decline to disturb the trial court's limitation on John Cox's excess water right to a 45-day period of use ending on May 15.

### d. The trial court properly denied a "junior right" to excess water for lands not recognized in the Pope Decree

Initially in this proceeding, the trial court granted a "junior right" in excess water. Under the trial court's initial ruling, a "junior" rights holder is one who either (a) was not confirmed a right in the Pope Decree, but who had been making beneficial use of excess water pursuant to an Achepohl Certificate or (b) a party who had rights under the Pope Decree, but whose use of excess water meant the party was using more water than allocated to it under the Pope Decree. CP at 1082-88 (2002 Report of the Court at 105-11). In the trial court's view, this award harmonized the decision in *Achepohl* with the Pope Decree. CP at 1087.

After further reflection, the trial court changed its mind. It concluded that the Pope Decree precluded the use of excess water except on lands recognized in the Pope Decree. CP at 753 (2008 Suppl. Report of the Court at 29). The trial court found, however, that excess water could be used to fulfill the Northside users' Achepohl Certificate rights on lands confirmed under *Ahtanum*.

> The Pope Decree awarded 0.01 cfs for each irrigated acre, half of the quantity of water authorized for use in the certificates that issued following the earlier adjudication, the *Achepohl Decree*. The Court finds that excess water can be used, when available, on lands north of Ahtanum Creek that are confirmed rights in this proceeding, up to the 0.02 cfs per acre authorized in the appurtenant certificates.

CP at 458 (2009 Mem. Op. to the 2008 Suppl. Report of the Court at 3).

The Northside parties challenge the trial court's decision that excess water can be used only on lands recognized in the Pope Decree. They urge this court to embrace a more expansive view of "junior party." *See* Br. of John Cox at 24 (asking that this court recognize John Cox can use excess water, when available, to irrigate the additional lands confirmed to it under *Achepohl* but not recognized by the Pope Decree); Br. of AID at 24-27 (arguing that the federal *Ahtanum* litigation leaves room for the allocation of excess water to parties holding only an Achepohl Certificate). They ask that these "junior rights" apply to water that is in excess of what is already defined as excess water—that is, water that may remain after rights under the Pope Decree are fulfilled, and subordinate to qualifying Northside parties' rights in excess water. In other words, water that is in excess of excess water.

The United States characterizes the Northside parties as arguing that "defendants" as contemplated in the federal *Ahtanum* litigation meant all defendants joined in the litigation, not just those confirmed a right. Resp. Br. of United States at 24. That argument, responds the United States, "is plainly inconsistent with the Ninth Circuit's express holding that the [Achepohl] Decree disposes of water right claims for the tracts of the 456 defendants not included in Appendix B." *Id.* In addition, much of the Northside parties' argument on this question relate to their assertion that the federal *Ahtanum* litigation was not an adjudication of their water rights, a contention we reject. *Supra* pp. 28-31.

Because the federal *Ahtanum* litigation was an adjudication, that leaves at the heart of the excess water question a perceived tension between the Code Agreement, the *Ahtanum* cases, and *Achepohl*. It is troubling at first blush that *Ahtanum* makes no direct mention of *Achepohl* or the fact that many of the Northside litigants in *Ahtanum* were exercising rights under *Achepohl*. But because Ahtanum Creek would have been entirely controlled by the Nation's treaty-reserved rights *but for* the Code Agreement, *Ahtanum* I, 236 F.2d at 340, an Achepohl Certificate is meaningless if the party was not *also* a party to the 1908 Code Agreement. *See* CP at 966 (trial court's 2003 Mem. Op. re: Ahtanum Creek Threshold Legal Issues) (reasoning that "even if an *Acquavella* claimant can prove they were not properly joined to the *U.S. v. Ahtanum* proceeding, they must also prove, as every single water user was require to do in that proceeding, that they are successors to a signatory of the 1908 Code Agreement"). The *Ahtanum* II court determined that to have been a party to the 1908 Code Agreement, one had to have been making beneficial use of the water in 1908. If a party in the federal *Ahtanum* litigation could not or did not show this, or did not join the *Ahtanum* litigation at all, then they were denied a right under *Ahtanum* II. Such a denial—in effect a recognition that the party was not a signatory to the Code Agreement—worked to void the party's Achepohl Certificate. Thus, we hold that the trial court properly denied "junior rights" to use "excess water" on lands not recognized by the Pope Decree.[13]

---

[13] At various points, John Cox asks that this court confirm a right for it to irrigate

To summarize on the issue of rights in excess water, as a general proposition we agree with the trial court that Northside users are not precluded as a matter of law from taking an interest in excess water in those years it is available (and to reiterate, in no way is the Nation required to ensure excess water is available). But we agree with the trial court's limits on those rights, namely that they cannot be exercised after July 10, that they may be limited to a 45-day period ending on May 15, and that rights in excess water cannot be exercised by parties that were not confirmed a right in the first instance under the Pope Decree.

> 5. The trial court erred when it applied the future use excuse in RCW 90.14.140(2)(c) to the Hagemeiers

The trial court confirmed a water right to the Hagemeiers. CP at 798. DOE argued that this right should have been denied because the Hagemeiers relinquished the right through a continuous period of nonuse. CP at 479. The trial court disagreed, finding that the Hagemeiers showed an excuse for nonuse under RCW 90.14.140(2)(c). *Id.* DOE cross-appeals on this issue. As a preliminary matter, we recognize AID's authority to pursue this issue on behalf of the Hagemeiers.

The Hagemeiers bought irrigated land in approximately 1986 intending to live on it and use it as pasture. CP at 2842. Career obligations kept them from carrying out their plans for nearly nine years. *Id.* at 2843. During that time, no use was made of the land. *Id.* After five successive years of nonuse, Washington's

---

lands confirmed to it under *Achepohl*, but not under the Pope Decree. *See, e.g.*, Br. of John Cox at 24. Consistent with our discussion here, we decline John Cox's invitations.

water code considers a water right relinquished. RCW 90.14.160, .170, .180. But the water code provides some excuses for nonuse that can avoid relinquishment. RCW 90.14.140. Once the five-year period of nonuse is proved, the party asserting the right bears the burden of showing an applicable excuse under the statute.

Here, the claimed excuse under the statute is the "determined future development" exception. Under the statute, "there shall be no relinquishment of any water right . . . [i]f such right is claimed for a determined future development to take place either within fifteen years of July 1, 1967, or the most recent beneficial use of the water right, whichever date is later." RCW 90.14.140(2)(c).

The interpretation of a statute is a question of law we review de novo. *City of Seattle v. Burlington N. R.R.*, 145 Wn.2d 661, 665, 41 P.3d 1169 (2002). In construing the statute at issue, this court has said that a "determined future development" means there is a firm definitive plan in place prior to the end of the five-year grace period, which must be completed within fifteen years. *R.D. Merrill Co. v. Pollution Control Hearings Bd.*, 137 Wn.2d 118, 142-43, 969 P.2d 458 (1999). To read the statute as allowing a plan to be determined at any point during the 15-year period would read the five-year grace period out of the statute and nullify the automatic presumption of relinquishment that attaches after five years of nonuse. *Id.* In addition, in *R.D. Merrill* we cautioned that the excuses for nonuse must be construed narrowly in order to respect our water code's preference that water be beneficially used. *Id.* at 140.

Before the trial court, DOE argued that resuming irrigation of land after a lengthy period of nonuse is not "development." The trial court disagreed, reasoning that "[l]and that has not been irrigated and has sat idle for ten years, as was the case with the Hagemeiers' property, would certainly need development prior to being suitable for irrigation." CP at 479-80.

The trial court's conclusion reads the "determined future development" exception too broadly. Nothing in Clifford Hagemeier's testimony indicates that the Hagemeiers took any steps toward "development," even if development is considered as an intent to resume irrigation during the nine years the land sat idle. CP at 2840-44. We hold that the trial court erred in applying the "future development exception" of RCW 90.14.140(2)(c) for nonuse to the Hagemeiers.

6. Individual denials based on failure to satisfy the trial court's four-part test

To reiterate, in order to have a water right confirmed in this adjudication, the trial court required every Northside claimant to show that (1) the water was beneficially applied to the land, (2) a predecessor on the land signed the Code Agreement, (3) the property also received an Achepohl Certificate, and (4) the property in question was included in an answer filed in the federal *Ahtanum* litigation. CP at 934. The trial court ruled that various parties failed to show one or more of these prerequisites. These parties—The Brules, La Salle High School, and Hull Ranches—now challenge its rulings, seeking to excuse any failure to satisfy the trial court's four-part test.

a. The trial court properly determined that the Brules predecessor in interest, W.C. Cope, was served in the federal *Ahtanum* litigation

The trial court found that there was no showing the Brules predecessor in interest filed an answer to the federal *Ahtanum* litigation. *See* CP at 495-96. The Brules now argue that their predecessor was never served in the *Ahtanum* litigation, and thus they cannot be bound by the Pope Decree.

The trial court made a finding of fact that the Brule's successor-in-interest did not file an answer in *Ahtanum*. The trial court also concluded that the successor-in-interest was served with the *Ahtanum* summons and complaint. CP at 495. The owners of the land at the time of the *Ahtanum* summons and complaint were W.C. Cope and his wife, Inez Cope. CP at 3625. But the summons and complaint was left with a person identified as W.C. Cope's wife, Rose Cope. YIN Ex. 427, at 2 (record of service of *Ahtanum* summons and complaint). The Brules argue that the discrepancy between the first names renders the record of service insufficient evidence to demonstrate that a Brule predecessor was served in the *Ahtanum* litigation.

We review findings of fact under the substantial evidence test, which is evidence of sufficient quantum to persuade a fair-minded person of the truth of the declared premise. *Ridgeview Props. v. Starbuck*, 96 Wn.2d 716, 719, 638 P.2d 1231 (1982). Here, despite the discrepancy in the name, there is sufficient evidence to persuade a fair-minded person that the correct W.C. Cope was served. No evidence is presented that there was another W.C. Cope using the waters of

Ahtanum Creek. It was reasonable for the trial court to conclude there was but one, and he was served with notice of the *Ahtanum* litigation.

The Brules also argue that the trial court failed to address the apparent fact that subsequent transfers of the property took place during the federal *Ahtanum* litigation, and no substitution of the new owners was ever made. This, however, is a question that neither the trial court nor we have any jurisdiction over, as it concerns a claimed procedural error made by the *Ahtanum* court, which we are powerless to correct. We hold that substantial evidence supports the trial court's finding that the Brules' predecessor-in-interest was properly served in the *Ahtanum* litigation, and the Pope Decree is therefore binding on the Brules.

> b. The trial court properly determined that La Salle High School's predecessors in interest were served in the federal *Ahtanum* litigation

At the time the federal *Ahtanum* litigation commenced, the La Salle property was owned by Jeannie Goodman. CP at 934-35. She was served with the *Ahtanum* summons and complaint but died shortly thereafter. *Id.* Her land was sold in part to Wade Langell and in part to H.A. Richmond. *Id.* The trial court found that Langell and Richmond were served with the *Ahtanum* summons and complaint and were subsequently denied rights in the Pope Decree. *Id.* at 935. It therefore denied rights to La Salle. *Id.*

La Salle now argues that Langell and Richmond should have been substituted for Goodman in accordance with FRCP 25(a)(1), and that because they were not, we have no way of knowing if the summons and complaint they were

served pertained to what is now the La Salle land or some other parcel of land elsewhere along Ahtanum Creek. Br. of La Salle at 17-19.

We are not persuaded by this argument. FRCP 25(a)(1) did not require substitution of Goodman for Langell and Richmond. As the United States points out, it is a permissive rule whose purpose is to allow dismissal of a deceased party, so that the closing of an estate is not delayed. Resp. Br. of United States at 37 (citing *Anderson v. Yungkau*, 329 U.S. 482, 485, 67 S. Ct. 428, 91 L. Ed. 436 (1947)). And, it was within the *Ahtanum* district court's discretion to join Langell and Richmond rather than substitute them for Goodman. *See Sun-Maid Raisin Growers of Cal. v. Cal. Packing Corp.*, 273 F.2d 282, 284 (9th Cir. 1959) (explaining in the context of FRCP 25(a) that "[s]ubstitution or joinder is not mandatory where a transfer of interest has occurred"). As with the Brules, if there was a procedural error, we lack jurisdiction to correct it. The trial court correctly concluded that La Salle's predecessors interest were properly served in *Ahtanum* and were subsequently denied a right in that proceeding. La Salle is precluded from claiming rights in this proceeding. We hold that substantial evidence supports the trial court's finding that La Salle's predecessor in interest was properly served in the *Ahtanum* litigation, and the Pope Decree is therefore binding on La Salle.

c. The trial court properly denied Hull Ranches a water right on the basis that the *Ahtanum* II court found the Hull Ranches' predecessor in interest did not sign the Code Agreement

In considering the parcel that is now owned by Hull Ranches, the *Ahtanum* II court noted that "[i]t appears from the answer itself that the land was not owned by a 1908 signatory." *Ahtanum* II, 330 F.2d at 917 (App. A). Accordingly, the trial court here denied Hull Ranches a water right. CP at 1235. AID now argues on behalf of Hull Ranches that the *Ahtanum* court was mistaken and that in fact the Code Agreement was signed by an agent of the owner of the parcel at the time. Br. of AID at 28-33. While this may be the case, the trial court concluded the evidence AID puts forth concerning agency was also available to the *Ahtanum* II court, which resolved this issue. CP at 492. We cannot disturb the Ninth Circuit's judgment that the evidence was insufficient to show the predecessor on the Hull Ranches land was not a signatory to the Code Agreement. We therefore hold that the trial court did not err in denying water rights to Hull Ranches.

7. Claimed clerical errors

AID argues that the trial court committed certain clerical errors that resulted in otherwise eligible parcels not having water rights confirmed to them. AID asks this court to remand to the trial court for confirmation of rights to those parcels. We agree with AID's position as to one of the parcels it brings to our attention but reject its claim of clerical error as to the remaining parcels.

### a. To the extent that the Chancery was erroneously deprived of a confirmed water right, the trial court is directed to correct the error

AID argues that the trial court appears to have made a mistake in failing to confirm a water right to the Chancery in the 2009 CFO. The parcel at issue is one of three parcels belonging to the Chancery, the other two of which were confirmed a right. All three appear to have met the trial court's requirements to be confirmed a water right. *See* CP at 830-32 (Suppl. Report at 106-08). And there is no evidence the trial court found any reason not to confirm a right to all the parcels held by the Chancery. Thus, AID is likely correct that a clerical mistake occurred here.

However, the United States argues that AID had several months to correct this apparent omission, as it first occurred in the trial court's 2008 supplemental report. Resp. Br. of United States at 39. Because AID did not timely act, the United States argues that RAP 2.5(a) should prevent review of this question.

The rules of appellate procedure are flexible to allow for the fair administration of justice. This was an enormous adjudication, involving thousands of parties. In this instance, we are not inclined to irrevocably punish AID and the Chancery for its oversight, when the trial court made the same oversight. AID asks that we remand to the trial court to correct this error. Br. of AID at 34. Assuming an error did occur, as appears likely, we direct the trial court to correct it on remand.

   b. The Splawn, Richardson, and Lynde parcels were not denied a water
      right due to clerical error on the part of the trial court

With regard to these parcels, AID failed to present the trial court with evidence concerning these parcels after the trial court specifically asked AID to do so. CP at 897-98; Resp. Br. of United States at 39. Accordingly, these parties were not confirmed a right. AID asks this court to correct this "clerical error," akin to its argument concerning the Chancery parcel. But this was not a clerical mistake of the trial court. AID had an affirmative duty to provide the trial court with additional information, and it did not do so. This does not strike us as a simple oversight, as may be the case with the Chancery parcel. We affirm the trial court's denial of a water right to the Splawn, Richardson, and Lynde parcels.

## CONCLUSION

We hold that the decision in *Ahtanum* II, 330 F.2d 897 was an adjudication of nontribal water rights. However, the federal *Ahtanum* litigation did not preclude the trial court here from considering the quantification of irrigable land on the reservation and we remand for further proceedings on this question. On remand, the trial court must also consider the Nation's right to store water.

We affirm the trial court's conclusions regarding the rights of nontribal claimants to so-called excess water, reverse the trial court's application of the "determined future development" excuse under RCW 90.14.140(2)(c) for nonuse of the Hagemeiers' claimed water right, affirm the trial court's denial of several individual water rights claims, and remand to the trial court to correct an apparent clerical error regarding an individual parcel belonging to the Chancery.

Appropriate findings of fact and conclusions of law should be made on remand in accord with the parties' concessions at the appellate phase.

This has been a lengthy and complex water right adjudication, and we commend the trial court and the parties for their diligent work over the many years they have lived with this case. Our decision today advances this adjudication one step closer to finality.

Stephens, J.

WE CONCUR:

Madsen, C.J.

J.M. Johnson, J.

Wiggins, J.

Owens, J.

González, J.

Fairhurst, J.

Chambers, J.P.T.