# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | | |
|---|---|---|
| ERIC HOOD, an individual, | ) | No. 73165-3-I |
| | ) | |
| Appellant, | ) | |
| | ) | DIVISION ONE |
| v. | ) | |
| | ) | UNPUBLISHED OPINION |
| SOUTH WHIDBEY SCHOOL | ) | |
| DISTRICT, a public agency, | ) | |
| | ) | |
| Respondent. | ) | FILED: September 6, 2016 |

TRICKEY, J. — Eric Hood sued the South Whidbey School District under the Public Records Act, chapter 42.56 RCW. With the parties consent, the trial court conducted a hearing in this case on the basis of documentary evidence. The trial court concluded that Hood was entitled to a penalty award of $7,150 for the District's untimely production of certain documents.[1] It rejected Hood's other claims.[2] The court also concluded that Hood was entitled to $5,309.95 in attorney fees and costs.[3]

Hood appeals the underlying judgment and the award of attorney fees. He argues that the trial court erred when it determined that the District's search for responsive records was reasonable, penalized the District "only for untimely disclosures while ignoring other violations," denied his proposed groupings for penalties, erroneously applied mitigating and aggravating factors to its penalty

---

[1] Clerk's Papers (CP) at 241.
[2] CP at 3100.
[3] CP at 46.

calculations, and erroneously calculated the penalty period.[4] He also claims that the trial court should have granted all of his requested attorney fees.

Based on our de novo review, we conclude that the trial court did not err except when it calculated Hood's award of attorney fees and costs. Accordingly, we affirm in part, reverse in part, and remand for further proceedings.

## FACTS

Hood worked as a teacher for the District from 1996 to 2010.[5] In 2010, the District decided not to renew Hood's teaching contract.[6] Through his union, Hood challenged the decision in binding arbitration.[7] An arbitrator upheld the District's non-renewal decision.[8] Hood subsequently filed multiple lawsuits against the District in federal court.[9] Hood also made numerous public records requests of the District under the Public Records Act (PRA).[10] The District's responses to those requests are the subject of this lawsuit.

Hood began requesting public records from the District in June 2011.[11] That year, Hood requested records on June 16, July 1, July 7, July 10, and July 14.[12] By August 5, Hood had made 25 different requests.[13] Hood made additional record requests on August 18 and November 1 of that year.[14]

---

[4] Appellant's Am. Opening Br. at 2.
[5] CP at 2731.
[6] CP at 219.
[7] CP at 219.
[8] CP at 219.
[9] CP at 220.
[10] CP at 224.
[11] CP at 898.
[12] CP at 224, 898-99.
[13] CP at 224, 938-43.
[14] CP at 224, 900-02.

2

Hood continued requesting records from the District over the next few years. In 2012, Hood requested records on June 19, September 11, October 4, October 10, October 16, October 18, and November 15.[15] In 2013, Hood requested records on January 24 and January 28.[16] In 2014, Hood requested records on January 30.[17] In total, Hood made approximately 37 requests for records.[18]

During this same time period, Hood also requested public documents from several other entities, including the Arlington School District, the Office of the Superintendent of Public Instruction, the Washington State Attorney General's Office, the Washington State Auditor's Office, the Coupeville School District, and the Washington Schools Risk Management Pool.[19]

Many of Hood's requests for records were very broad in scope.[20] Essentially, Hood requested any record of any kind having anything to do with him from 1999 to 2014.[21] For example, a request on July 10, 2011 sought "[a]ny records about [Hood] made by any current or former district administrators and/or board members dating from September 1999 to the present."[22] Similarly, a request on November 1, 2011 sought "all District records about, mentioning, referring to, or regarding [Hood] or any member of his family from July 5, 2011 to the present and, if any exist, any previously undisclosed records about, mentioning, referring

---

[15] CP at 224, 903-07.
[16] CP at 224, 908-09.
[17] CP at 224.
[18] CP at 57.
[19] CP at 224, 901-05.
[20] CP at 224.
[21] CP at 225.
[22] CP at 225, 946, 1010, 1016, 2740.

to, associated with or regarding either [Hood] or his non-renewal or both dating from September 1999 to the present."[23]

The District responded to Hood's requests on a regular basis. For example, in 2011, the District responded on June 17, July 5, July 9, July 12, July 20, July 28, August 5, August 17, August 22, September 6, September 7, September 9, September 14, September 20, October 14, November 7, December 14, and December 21.[24] In 2012, the District responded on January 2, June 21, September 11, September 26, October 12, October 22, October 23, October 31, November 3, November 8, November 19, November 20, November 27, November 29, December 12, and December 19.[25] In 2013, the District responded on January 25, January 31, February 5, February 14, February 20, March 12, March 14, March 25, and May 2.[26] In 2014, the District responded on February 5, February 14, February 20, February 28, March 12, and March 14.[27] Hood and the District exchanged e-mails during these time frames as well.

The District provided thousands of records in response to Hood's requests.[28] In 2011, the District provided records on July 20, July 27, August 16, August 31, September 7, September 20, October 14, and December 16.[29] In 2012, the District provided records January 2, June 21, September 11, October 9, October 16, November 13, November 27, November 29, December 12, and

---

[23] CP at 225.
[24] CP at 225, 899-903, 995, 1002-92.
[25] CP at 225-26, 903-07, 1096-1182.
[26] CP at 226, 908-09, 1187-88, 1193-1201.
[27] CP at 225-26, 908-10, 1202-1209.
[28] CP at 220.
[29] CP at 226, 893-895, 899-903.

December 18.[30] In 2013, the District provided records on January 22, January 25, and May 2.[31] In 2014, the District provided records on February 5, February 28, and March 14.[32]

In June 2012, Hood commenced this action against the District in Island County Superior Court.[33] Among other things, Hood alleged that the District violated the PRA when it responded to his July 2011 record requests.[34] In August 2013, Hood filed an amended complaint against the District alleging many additional violations of the PRA when it responded to his later requests.[35]

In March 2014, Hood moved for summary judgment.[36] He argued that the District violated the PRA in numerous ways when it responded to his requests from June 2011, July 2011, November 1, 2011, June 19, 2012, September 11, 2012, October 10, 2012, October 16, 2012, October 18, 2012, November 15, 2012, January 24, 2013, and January 28, 2013.[37] He proposed grouping the violations into nine different groups, and he sought a total penalty award of $390,795.[38] With his motion, Hood submitted affidavits from himself and from his attorney.[39]

The District responded and argued that its searches were reasonable, that Hood's allegations were speculative, insufficient, and meritless, and that Hood's

---

[30] CP at 226, 903-07.
[31] CP at 226, 895-96, 907-09.
[32] CP at 226, 896, 909-10.
[33] CP at 2816.
[34] CP at 2816.
[35] CP at 2729-2766.
[36] CP at 898-937.
[37] CP at 226, 915-30.
[38] CP at 930-36.
[39] CP at 910.

5

request for $390,000 in penalties was unsupportable.[40] With its response, the District submitted declarations from several District employees and attorneys.

On June 27, 2014, the matter proceeded to a hearing.[41] The parties agreed that the hearing on the merits could be conducted on the basis of affidavits pursuant to RCW 42.56.550(3).[42] Thus, with the parties' consent, the court conducted a trial on the basis of the submitted papers.[43] The court explicitly stated that it "balanced and weighed the evidence" and "resolved all material factual issues and issues of credibility, as it would if it had heard oral testimony."[44]

On September 15, 2014, the trial court issued its memorandum decision.[45] It determined that Hood was entitled to penalty award of $4,890 for the District's untimely production of documents in response to Hood's June 2011 requests and Hood's July 2011 requests.[46] It also determined that Hood was entitled to a penalty award of $2,260 for the District's untimely production of documents in response to Hood's November 1, 2011 request.[47] It rejected the remainder of Hood's claims.[48]

On December 15, 2014, the trial court entered comprehensive findings of fact and conclusions of law.[49] It also entered final judgment, which granted Hood's

---

[40] CP at 764-808.
[41] CP at 218.
[42] CP at 218, 3060.
[43] CP at 219, 3060.
[44] CP at 219.
[45] CP at 219, 3060-3100.
[46] CP at 3099.
[47] CP at 3099.
[48] CP at 3100.
[49] CP at 218-41.

motion for judgment in part, awarded Hood $7,150, and dismissed all other claims with prejudice.[50]

Hood subsequently moved for reconsideration.[51] He claimed that the discovery of five additional e-mails constituted newly discovered evidence establishing that the District's searches in response to Hood's July and November 2011 requests were not reasonable.[52] In a written decision, the court rejected these arguments and denied Hood's motion.[53] It entered an order denying reconsideration.[54]

Hood moved for attorney fees and costs.[55] In March 2015, the trial court entered its findings of fact, conclusions of law, and order on this motion.[56] The trial court concluded that Hood was entitled to an award of attorney fees and costs, but it declined to award Hood his full requested amount.[57] It reduced the amount of attorney fees requested by 50 percent and awarded Hood $5,309.95.[58]

Hood appeals.

## ANALYSIS

The PRA "is a strongly worded mandate for broad disclosure of public records." Hearst Corp. v. Hoppe, 90 Wn.2d 123, 127, 580 P.2d 246 (1978). The purpose of the act is "'nothing less than the preservation of the most central tenets

---

[50] CP at 28-29.
[51] CP at 160-65.
[52] CP at 161-63.
[53] CP at 49-61.
[54] CP at 30-31.
[55] CP at 132-36.
[56] CP at 32-38.
[57] CP at 34.
[58] CP at 37-38.

of representative government, namely, the sovereignty of the people and the accountability to the people of public officials and institutions.'" Wade's Eastside Gun Shop, Inc. v. Dep't of Labor & Indus., 185 Wn.2d 270, 277, 372 P.3d 97 (2016) (quoting Progressive Animal Welfare Soc. v. Univ. of Wash., 125 Wn.2d 243, 251, 884 P.2d 592 (1994) (PAWS)).

The PRA's disclosure provisions must be liberally construed and its exemptions narrowly construed. RCW 42.56.030. "The language of the PRA must be interpreted in a manner that furthers the PRA's goal of ensuring that the public remains informed so that it may maintain control over its government." Wade's Eastside Gun Shop, Inc., 185 Wn.2d at 277.

"The PRA requires state and local agencies to disclose all public records upon request, unless the record falls within a PRA exemption or other statutory exemption." Gendler v. Batiste, 174 Wn.2d 244, 251, 274 P.3d 346 (2012). "The agency refusing to release records bears the burden of showing secrecy is lawful." Fisher Broad.-Seattle TV LLC v. City of Seattle, 180 Wn.2d 515, 522, 326 P.3d 688 (2014). "The PRA does not, however, require agencies to 'create or produce a record that is nonexistent.'" Fisher, 180 Wn.2d at 522 (internal quotation marks omitted) (quoting Gendler, 174 Wn.2d at 252)).

"Agencies must make a sincere and adequate search for records." Fisher, 180 Wn.2d at 522. "When an agency denies a public records request on the grounds that no responsive records exist, its response should show at least some evidence that it sincerely attempted to be helpful." Fisher, 180 Wn.2d at 522.

The PRA prohibits "silent withholding" by agencies of records relevant to a public records request. PAWS, 125 Wn.2d at 270. "An agency must explain and justify any withholding, in whole or in part, of any requested public records." Resident Action Council v. Seattle Hous. Auth., 177 Wn.2d 417, 432, 327 P.3d 600 (2013). "Failure to reveal that some records have been withheld in their entirety gives requesters the misleading impression that all documents relevant to the request have been disclosed." PAWS, 125 Wn.2d at 270-71.

### Acceptance of Benefits

As an initial matter, citing RAP 2.5(b), the District contends that Hood waived his right to appeal because he accepted payment in satisfaction of the judgment.[59] We disagree.

In general, a party cannot accept the benefits of a trial court decision without losing the right to appeal. However, RAP 2.5(b)(1) provides four exceptions to this rule. Under RAP 2.5(b)(1)(iii), a party can accept the benefits of a trial court decision without losing the right to appeal "if, regardless of the result of the review based solely on the issues raised by the party accepting benefits, the party will be entitled to at least the benefits of the trial court decision."

This exception applies here. Regardless of the result of our review, Hood would be entitled to at least the money he has already accepted.[60] The District does not contend that Hood is entitled to any less money than he received in the judgment. In fact, the District proposed the penalty calculation that the trial court

---

[59] Resp't's Br. at 24-26.
[60] Resp't's Br. at 25.

adopted.[61] And the District defends this award on appeal as "proportional" and "appropriate."[62] Under these circumstances, we conclude that Hood did not waive his right to appeal by accepting payment.[63]

### Standard of Review

A threshold issue in this case is the standard of review, which the parties dispute. Hood asserts that we review de novo agency actions under the PRA when the sole evidence is documentary.[64] He further asserts that we are not bound by the trial court's factual findings regarding an agency's PRA violations.[65] The District asserts that because the trial court made credibility findings, weighed evidence, and resolved conflicting testimony, the substantial evidence standard is appropriate for any challenged factual finding.[66] We agree with Hood.

Under RCW 42.56.550(3), "[j]udicial review of all agency actions taken or challenged under RCW 42.56.030 through 42.56.520 *shall be de novo*."[67]

On appeal, "the appellate court stands in the same position as the trial court where the record consists only of affidavits, memoranda of law, and other documentary evidence." PAWS, 125 Wn.2d at 252. "Under such circumstances, the reviewing court is not bound by the trial court's findings on disputed factual issues." PAWS, 125 Wn.2d at 253.

---

[61] CP at 804-08.
[62] Resp't's Br. at 2, 48-49.
[63] Given our resolution of this issue, we deny Hood's motion to supplement the record under RAP 9.11, and we deny the District's cross-motion to supplement the record.
[64] Appellant's Am. Opening Br. at 17.
[65] Appellant's Am. Opening Br. at 17.
[66] Resp't's Br. at 27-28.
[67] (Emphasis added.)

The District relies on several cases for the proposition that "[t]he trial court's factual findings are given deference even where a case was decided entirely on documentary evidence."[68] Specifically, it cites State v. Kipp, 179 Wn.2d 718, 727, 317 P.3d 1029 (2014); In re Yakima River Drainage Basin, 177 Wn.2d 299, 340, 296 P.3d 835 (2013); Dolan v. King County, 172 Wn.2d 299, 310, 258 P.3d 20 (2011); and In re Marriage of Rideout, 150 Wn.2d 337, 351, 77 P.3d 1174 (2003). But none of those cases were brought under the PRA. Until the Supreme Court applies the principles from cases such as Dolan and Rideout when reviewing PRA decisions where the trial court resolved disputed factual issues, PAWS controls.

### Adequacy of Searches

Hood argues that the trial court erred when it determined that the District's searches for responsive records were reasonable.[69] We disagree.

The test for adequacy of a search for public records under the PRA is the same as that under the federal Freedom of Information Act. Neighborhood Alliance of Spokane Cty. v. Spokane Cty., 172 Wn.2d 702, 719, 261 P.3d 119 (2011). "[T]he focus of the inquiry is not whether responsive documents do in fact exist, but whether the search itself was adequate." Neighborhood Alliance, 172 Wn.2d at 720.

"The adequacy of a search is judged by a standard of reasonableness, that is, the search must be reasonably calculated to uncover all relevant documents." Neighborhood Alliance, 172 Wn.2d at 720. "What will be considered reasonable will depend on the fact of each case." Neighborhood Alliance, 172 Wn.2d at 720.

---

[68] Resp't's Br. at 27.
[69] Appellant's Am. Opening Br. at 2.

11

"[T]he issue of whether the search was reasonably calculated and therefore adequate is separate from whether additional responsive documents exist but are not found." Neighborhood Alliance, 172 Wn.2d at 720. "'[A] search need not be perfect, only adequate.'" Neighborhood Alliance, 172 Wn.2d at 720 (quoting Meeropol v. Meese, 252 U.S. App. D.C. 381, 395, 790 F.2d 942 (1986)).

"[A]gencies are required to make more than a perfunctory search and to follow obvious leads as they are uncovered." Neighborhood Alliance, 172 Wn.2d at 720. "The search should not be limited to one or more places if there are additional sources for the information requested." Neighborhood Alliance, 172 Wn.2d at 720. "Th[at] is not to say, of course, that an agency must search *every* possible place a record may conceivably be stored, but only those places where it is *reasonably likely* to be found." Neighborhood Alliance, 172 Wn.2d at 720.

At the summary judgment stage, the agency bears the burden of showing its search was adequate. Neighborhood Alliance, 172 Wn.2d at 720-21. "To do so, the agency may rely on reasonably detailed, nonconclusory affidavits submitted in good faith." Neighborhood Alliance, 172 Wn.2d at 721. These "should include the search terms and the type of search performed, and they should establish that all places likely to contain responsive materials were searched." Neighborhood Alliance, 172 Wn.2d at 721.

Here, after conducting our own review of the record, we conclude that the District conducted adequate searches in response to Hood's record requests. The record establishes that the District's searches were reasonably calculated to uncover all relevant documents.

Declarations of District employees detail the District's searches in response to Hood's requests. In general, they describe the procedure employed to identify individuals likely to have responsive records, the likely location of records, and the search terms utilized to search for records.

Of particular interest are the declarations of Josephine Moccia, the District Superintendent, and Brian Miller, the District Technology Manager.

Moccia personally oversaw the District's response to each of Hood's public records requests after her arrival in the District in July 2011.[70] Moccia consulted with the individual District staff members directly responsible for gathering responsive records, directed individuals with personal knowledge of potentially responsive records to gather those records, and in some instances, personally searched for responsive records within her direct control.[71]

Moccia testified that in response to Hood's July 2011 requests, she directed Miller to work with legal counsel "to identify key search terms and potential record custodians and then to search those custodians' electronic files for responsive records."[72] The potential custodians included current and former District administrative staff, the District's board members, and the teachers, counselors, and union representatives identified by Hood.[73]

Moccia testified that individual District staff members also searched their computer files for responsive records.[74] For example, Moccia directed her

---

[70] CP at 419.
[71] CP at 419.
[72] CP at 2812.
[73] CP at 2812.
[74] CP at 2813.

13

assistant, Sue Terhar, to search Terhar's computer for any responsive records.[75] Additionally, District administrators responsible for the specific programs identified in Hood's requests were directed to locate and assemble potentially responsive records.[76] Likewise, school and administrative staff from Hood's former school were directed to locate and assemble potentially responsive records.[77]

The District's outside counsel reviewed the assembled records in July, August, September, and October 2011.[78] Exempt records were withheld and logged as additional responsive records were gathered.[79] The District provided responsive, non-exempt records in several installments between July and October 2011.[80]

Moccia testified that Hood's November 2011 requests were "largely duplicative" of his July 2011 requests.[81] Nonetheless, Moccia directed Miller and other central office staff to locate and assemble responsive records.[82] Further, school and administrative staff from Hood's former school "were again directed to locate and assemble potentially responsive records."[83]

---

[75] CP at 2813.
[76] CP at 2813.
[77] CP at 2813.
[78] CP at 2813.
[79] CP at 2813-14.
[80] CP at 2814.
[81] CP at 2815.
[82] CP at 2815.
[83] CP at 2815, 421.

The District's outside counsel also assisted in this review and production.[84] The District provided Hood non-exempt records responsive to his November 2011 requests in several installments between December 2011 and January 2012.[85]

After Hood filed this lawsuit against the District in 2012 alleging violations of the PRA in responding to his July 2011 requests, Moccia carefully reviewed the allegations in his complaint.[86] In response to his allegations, Moccia "directed that the District undertake another review of its files to ensure that no responsive, non-exempt records were inadvertently withheld" from Hood.[87] During this search, the District discovered a file of binders Moccia's predecessor maintained.[88] After reviewing these records, the District produced additional records to Hood in September 2012.[89]

Between June 2012 and February 2013, Moccia continued to receive dozens of public records requests from Hood.[90] Many of these requests were duplicative "to the broadest parts of [Hood's] July 2011 and November 2011 public record requests" as well as his other requests.[91]

In response to Hood's continued requests, Moccia "directed the completion of additional searches of the District's computer systems by [Miller] and other District technology support staff."[92] Moccia testified that District administrators,

---

[84] CP at 2815.
[85] CP at 2815-16.
[86] CP at 2816.
[87] CP at 2817.
[88] CP at 2817.
[89] CP at 2817.
[90] CP at 2818.
[91] CP at 2818.
[92] CP at 2819.

administrative support staff, and individual school board members were "notified of requests related to them and requested to search for and produce any additional records responsive to Hood's specific requests."[93] For example, upon receiving Hood's requests for records regarding an alleged state audit of the District, Moccia asked the District's Assistant Superintendent for Business to locate responsive records.[94] And when asked by Hood for records regarding student attendance at Bayview School, she asked the director of the school and his secretarial staff to locate responsive records.[95]

Moccia testified that the District spent hundreds of hours of staff and attorney time and thousands of dollars responding to Hood's requests.[96] She further testified:

> Throughout the process of responding to [Hood's] numerous requests, I fully intended that the District provide [Hood] all identifiable, responsive, non-exempt records that the District located. I believe that the District's searches and productions were reasonable in their scope and conducted with diligence and in good faith. I have no personal motivation to withhold material from [Hood] or to not disclose the records he requested. I have not intentionally destroyed any records that [Hood] was requesting or directed that anyone else destroy or not disclose records to [Hood] to prevent him from accessing such records. Any errors in the District's search and production processes were inadvertent and not the result of any intention to hinder [Hood's] access to public records from the District.[97]

---

[93] CP at 2819.
[94] CP at 2819.
[95] CP at 2819.
[96] CP at 2820, 2814.
[97] CP at 2820.

Miller's declaration provides even greater detail than Moccia's declaration. Miller worked as the District's Technology Manager from 1993 to 2012 and then worked as the District's Director of Facilities and Operations.[98]

In response to Hood's July 2011 requests, Miller worked with the District's legal counsel to locate responsive records from the District's electronic databases.[99] Miller testified that he worked with the District's attorney to identify key search terms and potential record custodians for each request.[100] He then searched each of those custodians' electronic mail accounts for records.[101]

With his declaration, Miller provided a copy of the processing matrix he created to track his work on the July 2011 requests.[102] This detailed matrix lists several categories of information.[103] It provides (1) a description of each of Hood's requests, (2) the relevant date range for each request, (3) the search terms utilized for each request, (4) the systems searched, and (5) the potential custodians for each request.[104] With respect to Hood's July 2011 requests, the matrix shows that Miller searched the accounts of at least 40 individuals.[105]

Miller testified that he spent over 60 hours "carefully searching and reviewing email files for [Hood's] requests in the summer and fall of 2011."[106] He searched the personal e-mail accounts of each identified custodian on the District's

---

[98] CP at 2793.
[99] CP at 2794.
[100] CP at 2794.
[101] CP at 2794.
[102] CP at 2794, 2801-02.
[103] CP at 2801-02.
[104] CP at 2801-02.
[105] CP at 2801-02.
[106] CP at 2795.

"FirstClass server," a commercial product used to manage employees' communication and personal organization tools, such as e-mail, calendaring, and personal contacts.[107]

Around March 2011, the District changed its e-mail from FirstClass to "Google Apps, a cloud-based electronic mail system."[108] Unlike the FirstClass system, the District did not maintain physical control over the e-mail server.[109] Nonetheless, Miller also searched for e-mails in the Google Apps program.[110] During the search process, he discovered that the Google Apps program was only saving e-mails for a period of 45 days after their creation.[111] Miller reported the problem to Google and it was addressed going-forward.[112] However, due to this error, there is a period of time for which the District's e-mails were not archived.[113]

After assembling all responsive electronic records located in his searches, Miller provided them to the District's counsel for review.[114] Miller ultimately provided three CD-ROMs (compact disc, read-only memory) to Hood containing all of the non-exempt records that Miller was able to locate in response to Hood's July 2011 requests.[115]

In response to Hood's November 2011 requests, Miller duplicated the search efforts described earlier, using new search terms and time periods.[116] With

---

[107] CP at 2795.
[108] CP at 2796.
[109] CP at 2796.
[110] CP at 2796.
[111] CP at 2796.
[112] CP at 2797.
[113] CP at 2797.
[114] CP at 2797.
[115] CP at 2797.
[116] CP at 2798.

his declaration, Miller included the processing matrix he used to track his work on these requests.[117] This matrix, like the other, provides the same five categories of information, including the relevant search terms and potential custodians.[118] Once Miller had assembled records responsive to Hood's November 2011 requests and the District's counsel had reviewed them, he prepared another CD-ROM for production to Hood.[119]

In response to Hood's continued requests in September and October 2012, Miller searched both of the District's electronic mail systems—FirstClass and Google Apps—to locate any potentially responsive records.[120] He searched in the accounts of likely custodians of responsive records based on the individuals identified in Hood's requests.[121] With his declaration, Miller included a copy of the processing matrix he created to track his work on these requests.[122] Like the others, this matrix reflects the same categories of information, including the relevant search terms and potential custodians searched.[123]

Finally, Miller testified as follows:

Throughout the process of responding to [Hood's] requests, I have conducted all searches to the best of my ability, I have pulled and reviewed all responsive documents located by my searches, and I have worked with the District Superintendent and its counsel to provide all records located. I have no personal reason to withhold material from [Hood] or not to disclose the records he requested. No one has ever asked me to destroy records that [Hood] requested or suggested that records not be disclosed to him. To the contrary, my direction from the Superintendent has always been to disclose all

---

[117] CP at 2798, 2804.
[118] CP at 2804.
[119] CP at 2798.
[120] CP at 2798-99.
[121] CP at 2799.
[122] CP at 2799, 2806.
[123] CP at 2806.

19

responsive, non-exempt records. To the best of my knowledge and ability, that is exactly what I did.[124]

After reviewing the record, we are convinced that the trial court properly determined that the District's searches were adequate. These nonconclusory declarations from District employees provide significant detail about the type of search performed, the search terms utilized, and the locations searched. On these facts, it is clear that the District's searches were reasonably calculated to uncover all relevant documents.

Hood presents a number of arguments challenging the declarations of the District's employees. In general, he contends that their testimony was unreliable and incredible and that it misled the trial court.[125] We reject all of his arguments.

Hood argues that Moccia's statement that she directed Terhar to search Terhar's computer for responsive records is contradicted by Terhar's statement that she failed to perform a global search of her computer.[126] But Terhar also testified that if Hood's requests "pertained to anything that [she] might have had on [her] computer, [she] would search for it."[127] This is consistent with Moccia's statement.

Hood argues that the District's failure to search the files of Sue Raley, a teacher, was unreasonable.[128] But as the trial court correctly noted, "it was reasonable for the District to believe that a fellow teacher would not have District

---

[124] CP at 2799.
[125] Appellant's Am. Opening Br. at 21-22; Appellant's Reply Br. at 8-13.
[126] Appellant's Am. Opening Br. at 21.
[127] CP at 3046.
[128] Appellant's Am. Opening Br. at 22 n.17; Appellant's Reply Br. at 10.

records relating to another teacher."[129] And an agency need not search "*every* possible place a record may conceivably be stored, but only those places where it is *reasonably* likely to be found." Neighborhood Alliance, 172 Wn.2d at 720.

Hood argues that the District did not search potential custodians' electronic files until 2014.[130] He relies on declarations from two District employees to support this allegation. But these two declarations merely establish that in summer 2014, these employees searched their files for records responsive to Hood's 2014 requests and found e-mail correspondence from summer 2011.[131] These facts do not negate Moccia's assertion that individual staff members searched their computer files for records responsive to Hood's July and November 2011 requests.[132]

Hood argues that the District was obligated to search the individual computer files of any person who might have stored records because the District knew its e-mail system auto-deleted e-mails.[133] But Moccia testified that individual staff members searched their computer files.[134] This was sufficient.

Hood argues that the untimely disclosure of e-mails shows that the searches were unreasonable.[135] He also argues that the production of District records by other agencies shows that the searches were unreasonable.[136] He is incorrect on both accounts. The case law is clear that the issue of whether a

---

[129] CP at 227.
[130] Appellant's Am. Opening Br. at 22.
[131] CP at 140, 142-43.
[132] CP at 2813.
[133] Appellant's Am. Opening Br. at 37; see also Appellant's Reply Br. at 10.
[134] CP at 2813.
[135] Appellant's Am. Opening Br. at 22; Appellant's Reply Br. at 10-11.
[136] Appellant's Reply Br. at 11.

search was adequate "is separate from whether additional responsive documents exist but are not found." Neighborhood Alliance, 172 Wn.2d at 720.

Hood argues that the "evidence shows that [Moccia's] statements and declarations were incorrect."[137] He points out that Moccia did not tell employees which databases to search, that the District only named four employees whose computer files were searched, and that the District located previously undisclosed e-mails.[138] None of this establishes that Moccia's representations to the court about the District's searches were incorrect or misleading.

Lastly, Hood argues that documentary evidence "conflicts with District testimony" and "shows the unreasonableness of its searches."[139] In general, he points to untimely searches, untimely productions, the production of District records by other agencies, and the District's failure to search specific locations.[140] We reject these arguments. None of them establish that the District's searches were unreasonable.

## Penalties

Hood next argues that the trial court erred when it determined penalties.[141] Specifically, he contends that the court erred when it rejected seven of his nine proposed penalty groups, "penalized the District only for untimely disclosures while ignoring other violations," applied mitigating and aggravating factors, and calculated the lengths of time of violations.[142] We address these arguments below.

---

[137] Appellant's Reply Br. at 9.
[138] Appellant's Reply Br. at 9-10.
[139] Appellant's Reply Br. at 10.
[140] Appellant's Reply Br. at 10-11.
[141] Appellant's Am. Opening Br. at 37-61.
[142] Appellant's Am. Opening Br. at 2.

Penalty Grouping

Hood argues that the trial court abused its discretion when it rejected seven of his nine proposed penalty groups.[143] We disagree.

The PRA does not prevent the trial court from grouping multiple requests and treating them as one request. Zink v. City of Mesa, 162 Wn. App. 688, 722, 256 P.3d 384 (2011); Yousoufian v. Office of Ron Sims, 152 Wn.2d 421, 436 n.10, 98 P.3d 463 (2004) (Yousoufian I). A trial court may properly group records based on considerations such as time of production and subject matter. Sanders v. State, 169 Wn.2d 827, 864, 240 P.3d 120 (2010).

When a trial court groups records together, its decision is reviewed for abuse of discretion. Double H, L.P. v. Wash. Dep't of Ecology, 166 Wn. App. 707, 712-13, 271 P.3d 322 (2012). A trial court abuses its discretion if its decision is manifestly unreasonable or based on untenable grounds or reasons. Yousoufian v. Office of Ron Sims, 168 Wn.2d 444, 458, 229 P.3d 735 (2010) (Yousoufian II). A trial court's decision is manifestly unreasonable if the court, despite applying the correct legal standard to the supported facts, adopts a view that no reasonable person would take. Yousoufian II, 168 Wn.2d at 458-59.

Here, the trial court concluded that two groups existed for penalty calculation purposes—Hood's proposed Group 1 and Group 5. Group 1 consisted of the District's untimely responses to Hood's requests of June and July 2011.[144] Group 5 consisted of the District's untimely responses to Hood's requests of

---

[143] Appellant's Am. Opening Br. at 44.
[144] CP at 229.

November 1, 2011.[145] The court rejected seven additional proposed penalty groups. We address each of the rejected groups in turn.

*Group 2*

The trial court rejected Hood's proposed Group 2, which consisted of records produced in the September 11, 2012 supplemental production.[146] For this group, Hood requested $35 per day and a total penalty of $15,015.[147]

The trial court rejected Group 2 for the following reason:

> Hood's proposed Group 2 relates to records produced after this lawsuit was filed. Yet these records were produced in response to his July 2011 requests, and are thus encompassed by Group 1. The Court finds no legitimate basis for increased or duplicative penalties based on the fact that the records were produced after litigation was initiated. See, by analogy, Sanders 169 Wn.2d at 849-50. This proposed grouping is not appropriate.[148]

The trial court did not abuse its discretion when it denied this group. The record establishes that the records produced on September 11, 2012 were produced in response to Hood's July 2011 requests. A letter dated September 11, 2012 from the District to Hood confirms this.[149] So does the declaration of Carlos A. Chavez, an attorney for the District.[150]

---

[145] CP at 230.

[146] CP at 932.

[147] CP at 932.

[148] CP at 229.

[149] In relevant part, the letter states: "In response to the allegations raised in the above-referenced matter regarding your July 2011 public record requests, the District has undertaken another review of its records. Enclosed please find a CD-ROM containing a supplemental production of records related to your requests." CP at 1107.

[150] Chavez testified that he conducted another search for records after Hood filed his lawsuit in June 2012. During this search, he collected and reviewed materials for responsiveness to Hood's July 2011 requests. He found eight binders of hardcopy materials and, after reviewing the binders and the District's prior productions, he provided Hood a supplemental production of 398 pages. CP at 2863-67.

Hood claims that documents from this production were "silently withheld for 429 days" and that the court abused its discretion when it "minimized" the Group 2 violations.[151] But Hood's argument that the District silently withheld these records is speculative.[152] Additionally, as our Supreme Court has stated, "[W]e did not explicitly allow the potential silent withholding in PAWS to support a freestanding daily penalty award." Neighborhood Alliance, 172 Wn.2d 724.

In short, the trial court properly rejected Hood's claims of silent withholding and did not abuse its discretion when it rejected proposed Group 2.

## Group 3

The trial court rejected Hood's proposed Group 3, which consisted of documents that the District initially listed on an October 14, 2011 exemption log and then later produced with the September 11, 2012 supplemental production.[153] For this group, Hood requested $50 per day and a total penalty of $21,450.[154]

The trial court rejected Group 3 for the following reason:

Hood's proposed Group 3 contains exempt documents withheld by the District based on what Hood argues was a false claim of the deliberative process exemption. Hood argues that penalties should be assessed because the District initially asserted the deliberative process exemption of RCW 42.56.280 as the basis for withholding the documents, and this exemption didn't apply. But the District later asserted the work product and attorney-client privileges exemption for the withholding of the documents, and it was entitled to do so. [Sanders, 169 Wn.2d at 849-50]; [PAWS, 125 Wn.2d at 253.] The Court has conducted an in camera review of the documents Hood identified as potentially wrongfully withheld, and has determined that they are all exempt from disclosure. To the extent that Hood argues that the District's production of some exempt documents prevents it from asserting exemptions to other documents, this is plainly

---

[151] Appellant's Am. Opening Br. at 47.
[152] Appellant's Am. Opening Br. at 47-49; Appellant's Reply Br. at 13-19.
[153] CP at 229, 933.
[154] CP at 933.

incorrect. Under Sanders, the production of exempt documents does not necessarily waive exemptions as to other documents. 169 Wn.2d at 847-50. The Court finds no waiver in the present case. Group 3 is not a valid grouping for this case.[155]

The trial court's reasoning was correct. The trial court properly recognized that the relevant consideration is whether the documents are exempt from disclosure. Sanders, 169 Wn.2d at 849-50. If they are exempt, "the agency's withholding of them was lawful and its subsequent production of them irrelevant." Sanders, 169 Wn.2d at 850. The trial court also properly recognized that the District could assert a different exemption than the one initially claimed.

Our review of these documents confirms that a majority of them are exempt from disclosure under the work product exemption or the attorney-client privilege exemption. Hood presents no persuasive argument to the contrary. The remaining documents are not responsive to Hood's requests. Accordingly, the trial court properly concluded that the agency's withholding of those documents was lawful and the subsequent production of them was irrelevant. In short, the trial court did not abuse its discretion when it rejected Group 3.

*Group 4*

The trial court rejected Hood's proposed Group 4, which consisted of documents disclosed by other agencies. According to Hood, these documents show "that the District silently withheld [these documents] for a period of 604 days and/or destroyed them."[156] For this group, Hood requested $100 per day and a total penalty of $60,400.[157]

---

[155] CP at 229.
[156] Appellant's Am. Opening Br. at 51.
[157] CP at 933-34.

The trial court rejected Group 4 for the following reason:

> Hood proposes Group 4 for the documents that he alleges the District is silently withholding from him. The basis for Hood's argument appears to be that various documents were provided to him by *other* agencies in response to *other* public records requests, and therefore that the District must be intentionally silently withholding identical records. Hood's speculation has no record support, and the Court finds that additional penalties based on this speculation are unwarranted. Furthermore, to the extent they existed and were untimely produced, any such documents are already included in Groups 1 and 5 and are fully addressed in the penalties the Court will award for those groups.[158]

The trial court did not abuse its discretion when it rejected this group. "Purely speculative claims about the existence and discoverability of other documents will not overcome an agency affidavit, which is accorded a presumption of good faith." Forbes v. City of Gold Bar, 171 Wn. App. 857, 867, 288 P.3d 384 (2012). The fact that other agencies produced documents responsive to Hood's requests does not establish that the District's search was unreasonable. See Neighborhood Alliance, 172 Wn.2d at 720. Nor does it establish that the District silently withheld these documents.

Likewise, the fact that the District produced documents referencing unproduced documents does not establish that the District's search was unreasonable. See Neighborhood Alliance, 172 Wn.2d at 737. Nor does it establish that the District silently withheld the unproduced documents. Further, as we indicated earlier, potential silent withholding does not support a freestanding daily penalty award. Neighborhood Alliance, 172 Wn.2d 724. In short, the trial

---

[158] CP at 230.

court properly concluded that Hood's silent withholding claims were speculative, and it did not abuse its discretion when it rejected Group 4.

## Group 6

The trial court rejected Hood's proposed Group 6, which consisted of documents relating to a state audit of student enrollment at a district school, the District's "Highly Capable Learner's Program," administrative policies, and the collective bargaining agreement.[159] Hood asserts that these documents warrant higher penalties because they are records of public importance. For this group, Hood requested $50 per day and a total penalty of $26,200.[160]

The trial court rejected Group 6 for the following reason:

> Hood argues that certain documents he requested were of public importance, and requests increased penalties for his proposed Group 6 on this basis. The Court has determined that Hood's assertions are largely without merit, as detailed below. The Court does not find any legitimate basis for heightened penalties based on the alleged public importance of any of Hood's requests. Furthermore, any such records are subsumed in Groups 1 and 5 and are fully addressed in the penalties the Court will award for those groups.[161]

The trial court did not abuse its discretion when it rejected this proposed group. The trial court "fully accounted" for any public importance of these records when it considered this as an aggravating factor in assessing penalties.[162] Hood fails to persuasively explain why the alleged public importance of the documents factor should constitute its own freestanding penalty.

---

[159] CP at 934.
[160] CP at 935.
[161] CP at 230.
[162] CP at 237.

28

*Group 7*

The trial court rejected Hood's proposed Group 7, which consisted of allegedly undisclosed metadata.[163] Hood argues that the District ignored his requests for metadata "by providing only minimal header metadata for emails and absolutely none for non-email documents."[164] For this group, he requested the maximum, $100 per day, and a total penalty of $99,200.[165]

The trial court rejected Group 7 for the following reasons:

> Hood claims that he requested metadata in connection with many of his requests, and that the District has not provided such metadata. His proposed Group 7 seeks penalties for the alleged failure to produce metadata. In his email to Superintendent Moccia on July 7, 2011, Hood stated: "Note that all requests below include an explicit request for metadata (Fields for the 'To', 'From', and 'cc' are all recipients and are considered 'metadata.' See O'Neill v. City of Shoreline, 170 Wn.2d 138, 151-152[, 240 P.3d 1149] (2010))" [sic]. The District provided metadata in the form of the "to," "from," and "cc" fields (basic header information) on the emails it produced. Hood received an email from the Arlington School District in response to one of his records requests to that agency that also shows server routing information for the electronic communication in addition to the header information. Hood did not contest the District's assertions that this allegedly "missing" metadata does not supply any additional substantive content to the email communication. The Court finds that the server routing information Hood identifies as the metadata missing from the District's productions is immaterial to the actual substantive content of the records he requested.
>
> Further, the Court finds that the District included the metadata reasonably available to it and of the type explicitly requested by Hood in its responses to Hood's requests. The Court finds that the District complied with Hood's requests for metadata. Further, even if the District could have technically provided Hood a greater quantity or additional types of metadata, the Court finds that no additional penalties are appropriate in this regard.[166]

---

[163] CP at 935.
[164] Appellant's Am. Opening Br. at 26.
[165] CP at 935.
[166] CP at 230-31.

The trial court properly determined that the District complied with Hood's requests for e-mail metadata. The District provided the type of metadata that Hood specifically requested. Further, Miller expressly testified in his deposition that the e-mails he printed out in response to Hood's requests all had metadata.[167] He identified metadata as "[t]he header at the top, printed by, title, date, time, [and page number.]"[168] Miller also testified that he did not know if it was possible to retrieve the additional metadata Hood now asserts should have been provided.[169]

The trial court did not separately analyze the District's compliance with Hood's requests for metadata for non e-mail documents. But, based on our review of the record, we see no evidence that the District is "intentionally" and "silently" withholding metadata for non e-mail documents. Hood's claims to the contrary are speculative. In any event, the trial court also made it clear that even if the District could have provided Hood with additional metadata, it would not have awarded any additional penalties. The court viewed the penalty awarded as sufficient to address any violation based on metadata. This was within the trial court's discretion.

### Group 8

The trial court rejected Hood's proposed Group 8, which consisted of records on a CD-ROM, labeled July 27, 2011.[170] For this group, Hood sought the maximum per day penalty, $100, and a total penalty of $96,250.[171]

The trial court rejected Group 8 for the following reason:

---

[167] CP at 1217.
[168] CP at 1218.
[169] CP at 1218.
[170] CP at 935, 231.
[171] CP at 935.

Hood's proposed Group 8 relates to the alleged late production of a CD-ROM labeled with the date 7/27/11. There is no dispute that Hood received a copy of this CD on February 28, 2014. The District's evidence indicates that it believed that the CD had already been produced to Hood on August 16, 2011. Regardless of whether Hood received the CD itself for the first time in August 2011 or February 2014, the record reflects that its contents were either produced to him as part of previous productions or were exempt. In any event, the record supports a finding that any of the responsive records on the 7/27/11 CD are appropriately accounted for within Groups 1 and 5, and the Court declines to award additional penalties for this material beyond those calculated below.[172]

The trial court did not abuse its discretion when it rejected this group. Hood does not challenge the assertion that these records fall within Groups 1 and 5. Rather, he contends that the court abused its discretion "by ignoring both the severity of this violation and Hood's justification for making it a separate group."[173] But the court was entitled to reject Hood's arguments. He provides no persuasive argument to the contrary.

*Group 9*

The trial court rejected Hood's proposed Group 9 for various statutory violations of the PRA.[174] Hood claims that the District charged him money to view records, tried to charge him for other requests, and refused to provide records. For this group, Hood requested $25 per day and a total penalty of $10,425.[175]

The trial court rejected Group 9 for the following reasons:

Hood's proposed Group 9 encompasses his allegations that the District charged him to view records, tried to charge him for at least one other request, and refused to provide records because of their origin without justification. The Court rejects these allegations and

---

[172] CP at 231-32.
[173] Appellant's Am. Opening Br. at 57.
[174] CP at 935.
[175] CP at 936.

finds that additional or heightened penalties for these alleged violations are not appropriate.

Hood's principal allegation to support Group 9 is that the District charged him to review records. Hood had requested a large set of student attendance records, and the District located these records and was prepared to make them available to him. However, the records consisted of approximately 5,000 hard copy originals and required redaction of identifying student information from every page before they could be produced. See RCW 42.56.230(1). In an attempt to accommodate Hood's request, the District made a redacted exemplar of the student records and showed it to Hood on December 18, 2012. After reviewing the exemplar, Hood chose to narrow the scope of his request and the District prepared a first installment of redacted attendance records for his review. The District did not charge Hood to review that installment, but did explain that if Hood did not wish to pay for copies of the installment after he had the chance to review the records, the District would close the request.

Hood paid $11.10 for copies of the first installment of 74 redacted attendance records. RCW 42.56.120 provides that no fee shall be charged for the inspection of public records, nor for locating public documents and making them available for copying. However, a reasonable fee may be imposed for providing copies of public records, and to the extent that the agency has not determined the actual per page cost for photocopies, the agency may not charge in excess of fifteen cents per page. Seventy-four pages (the number of redacted attendance records prepared for Hood by the District) times $0.15 per page is $11.10, the amount Hood paid to the District. Hood acknowledges that he came to an agreement with the District avoiding further copying, and he did not request further installments. It would be an exaltation of form over substance to impose a penalty against the District where the records were prepared at Hood's request, where he voluntarily paid the $11.10, and where he reached an agreement with the District obviating the need for additional installments.[176]

The trial court did not abuse its discretion when it rejected this group. The trial court's recitation of the facts is supported by the record. Further, the trial court's reasoning provides a tenable basis for the court to conclude that additional

---

[176] CP at 232-33.

or heightened penalties for any statutory violations were not warranted. We reject Hood's arguments to the contrary.

### Groups 1 and 5 Penalty Amount

Hood next argues that the trial court abused its discretion when it determined that $5 per day was an appropriate penalty for Groups 1 and 5.[177] Specifically, he contends that the court abused its discretion when it considered the mitigating and aggravating penalty factors.[178] We disagree.

In Yousoufian II, the Supreme Court established a framework to guide trial courts' determinations of penalties within the range provided under the PRA. 168 Wn.2d 444.

At the outset, the "'principal'" factor for determining the appropriate daily penalty is the existence or absence of an agency's bad faith. Yousoufian II, 168 Wn.2d at 460 (quoting Amren v. City of Kalama, 131 Wn.2d 25, 37-38, 929 P.2d 389 (1997)). Other relevant factors relating to an agency's culpability include: (1) the economic loss to the party requesting the documents; (2) the public importance of the underlying issue to which the request relates, and whether the significance of the issue was foreseeable to the agency; and (3) the degree to which the penalty is an adequate incentive to induce further compliance. Yousoufian II, 168 Wn.2d at 460-63.

As a starting point, "a trial court must consider the entire penalty range established by the legislature." Yousoufian II, 168 Wn.2d at 466. "Trial courts may exercise their considerable discretion under the PRA's penalty provisions in

---

[177] Appellant's Am. Opening Br. at 46, 53.
[178] Appellant's Am. Opening Br. at 41.

33

deciding where to begin a penalty determination." Yousoufian II, 168 Wn.2d at 466-67.

Finally, courts should consider appropriate mitigating and aggravating factors. The Yousoufian II court identified seven mitigating factors and nine aggravating factors in determining PRA penalties.

The mitigating factors that may serve to decrease the penalty are

(1) a lack of clarity in the PRA request; (2) the agency's prompt response or legitimate follow-up inquiry for clarification; (3) the agency's good faith, honest, timely, and strict compliance with all PRA procedural requirements and exceptions; (4) proper training and supervision of the agency's personnel; (5) the reasonableness of any explanation for noncompliance by the agency; (6) the helpfulness of the agency to the requestor; and (7) the existence of agency systems to track and retrieve public records.

Yousoufian II, 168 Wn.2d at 467 (footnotes omitted).

Conversely, the aggravating factors that may support increasing the penalty are

(1) a delayed response by the agency, especially in circumstances making time of the essence; (2) lack of strict compliance by the agency with all the PRA procedural requirements and exceptions; (3) lack of proper training and supervision of the agency's personnel; (4) unreasonableness of any explanation for noncompliance by the agency; (5) negligent, reckless, wanton, bad faith, or intentional noncompliance with the PRA by the agency; (6) agency dishonesty; (7) the public importance of the issue to which the request is related, where the importance was foreseeable to the agency; (8) any actual personal economic loss to the requestor resulting from the agency's misconduct, where the loss was foreseeable to the agency; and (9) a penalty amount necessary to deter future misconduct by the agency considering the size of the agency and the facts of the case.

Yousoufian II, 168 Wn.2d at 467-68 (footnotes omitted).

These factors "may overlap, are offered only as guidance, may not apply equally or at all in every case, and are not an exclusive list of appropriate

considerations." Yousoufian II, 168 Wn.2d at 468. No one factor should control. Yousoufian II, 168 Wn.2d at 468. "These factors should not infringe upon the considerable discretion of trial courts to determine PRA penalties." Yousoufian II, 168 Wn.2d at 468.

"'[T]he trial court's determination of appropriate daily penalties is properly reviewed for an abuse of discretion.'" Yousoufian II, 168 Wn.2d at 458 (alteration in original) (quoting Yousoufian I, 152 Wn.2d at 431).

Here, the trial court properly exercised its discretion when it determined that a $5 per day penalty was an appropriate penalty for Groups 1 and 5, which resulted in a total penalty award of $4,890 for Group 1 and $2,260 for Group 5.[179] The trial court made this determination after carefully considering the entire penalty range, the relevant mitigating and aggravating factors set forth in Yousoufian II, and the other relevant factors identified in Yousoufian II, including the amount necessary to effectively deter future misconduct.

The court properly recognized that it had the discretion to determine a penalty amount between zero and $100. In 2011, the legislature amended the PRA to eliminate mandatory penalties. LAWS OF 2011, ch. 273 § 1. The trial court acknowledged this, stating that "the [l]egislature has vested [the court] with the discretion to award an appropriate penalty in an amount from zero to [$100] per day for such improper denials."[180]

The trial court also properly applied the Yousoufian II framework by carefully considered the relevant mitigating and aggravating factors.

---

[179] CP at 239-40.
[180] CP at 238.

The court identified several mitigating factors in this case. It concluded that the first mitigating factor—a lack of clarity in the PRA request—was applicable.[181] It found that "Hood made multiple, broad, overlapping, and occasionally duplicative requests."[182] It reasoned that "[b]ecause of this, it was virtually inevitable that the District would miss some of the records in its initial searches."[183]

The court also concluded that the second and third mitigating factors were applicable. These included the agency's prompt response and the agency's good faith, honest, timely, and strict compliance with the PRA. The court reasoned that the District's "reasonably prompt responses to the majority of Hood's requests and its good faith efforts to comply with the PRA, including the retention of counsel to assist in responding to Hood, mitigate the penalties that should apply here."[184]

The court agreed with Hood that the lack of proper training and supervision by the District was an aggravating factor.[185] But the court reasoned that the decision to utilize legal counsel mitigated the District's lack of training.[186] Accordingly, it concluded that "a minor increase in the penalty that would otherwise have been imposed but for the lack of training of the [District's] personnel [was] appropriate."[187]

The court rejected several other aggravating factors proposed by Hood. The court rejected Hood's argument that the District's unreasonable explanations

---

[181] CP at 237.
[182] CP at 237.
[183] CP at 237.
[184] CP at 237.
[185] CP at 233-34.
[186] CP at 233-34.
[187] CP at 234.

for instances of noncompliance was an aggravating factor. It found that the District's explanations for particular oversights in its searches and productions were "reasonable and fully understandable in light of the numerous broad and overlapping requests with which it was faced."[188]

The court rejected Hood's argument that the District's negligent, reckless, wanton, or bad faith conduct was an aggravating factor. It found that "[t]he record as a whole shows that the District did, in fact, act in good faith at all times, was not negligent, and provided reasonable explanations for its actions in response to Hood's requests."[189]

The court rejected Hood's argument that his personal economic loss was an aggravating factor. It found that Hood's assertion that he suffered actual personal economic loss was frivolous.[190]

And the court rejected Hood's argument that the public importance of his requests was an aggravating factor. It found that "the overwhelming majority of Hood's requests were directly related to his personal challenge to his nonrenewal as a teacher."[191] It found and that the "few requests that involved ostensibly public matters were tied to the work of his former supervisors and his attempts to discredit them."[192] It concluded that this aggravating factor "either does not apply, or applies only minimally, in the present case" and stated that it "has fully accounted for this factor in assessing an appropriate penalty against the District."[193]

---

[188] CP at 234.
[189] CP at 235.
[190] CP at 235.
[191] CP at 236.
[192] CP at 236.
[193] CP at 237.

After considering the relevant mitigating and aggravating factors, the court then considered the other relevant factors identified in Yousoufian II, including the amount necessary to effectively deter future misconduct.[194]

The court declined to adopt Hood's proposed multiplier of 15 for Group 1, which would have resulted in a penalty of $75 per day, and Hood's proposed multiplier of 12 for Group 5, which would have resulted in a penalty of $60 per day.[195] The court declined to impose these multipliers because Hood suffered no economic loss, his requests did not concern matters of public importance, and the District was "by no means intransigent in its responses."[196]

The court also reasoned that the $5 per day penalty was "appropriate and provides adequate incentive to induce future District compliance with the [PRA]."[197] The court explained that the nature and size of the agency was a relevant consideration. It stated:

> The Court pointedly notes our Supreme Court's statement in Yousoufian [II]: "The penalty needed to deter a small school district and that necessary to deter a large county may not be the same." [168 Wn.2d at 463.] This statement is directly applicable in the present case. While District personnel had not received proper training in PRA matters, the District, to its credit, engaged legal counsel to assist in responding to Hood's requests.[198]

The court noted that the District "is a relatively small school district serving approximately 1,400 students in its school programs," the District's steady decrease in student enrollment has led to a 15 percent drop in the District's budget

---

[194] See 168 Wn.2d at 461-63; CP at 238-241.
[195] CP at 238-240.
[196] CP at 238.
[197] CP at 239.
[198] CP at 238.

during the last six years, and the District does not have a dedicated full-time public records officer.[199]

Overall, we conclude that the trial court did not abuse its discretion when it determined that $5 per day was an appropriate penalty amount. The trial court's factual determinations are supported by the evidence, and the court's reasoning shows that it properly and carefully applied the Yousoufian II framework.

Hood argues that a penalty determination "should include consideration of culpability as a major factor."[200] This is true. But the court did consider culpability as a factor, and it stated that "[t]he record as a whole shows that the District did, in fact, act in good faith at all times, was not negligent, and provided reasonable explanations for its actions in response to Hood's requests."[201] As the court explained in its written memorandum, "This is by no means a case in which the requester was 'blown off' or that requests were treated in a cavalier manner."[202] After our own review of the record, we agree with the trial court in its assessment of the District's actions and its level of culpability.

Hood argues that the trial court abused its discretion, because it failed "to give due weight to the negligent degree to which District employees lacked training and oversight."[203] Hood asserts that the use of counsel should only mitigate penalties if counsel does not make significant errors and that "[i]gnoring [the] District's liability for counsel's failures is an abuse of discretion."[204] But reliance on

[199] CP at 225.
[200] Appellant's Am. Opening Br. at 37.
[201] CP at 235.
[202] CP at 3077.
[203] Appellant's Am. Opening Br. at 42.
[204] Appellant's Am. Opening Br. at 42-43.

legal counsel is an appropriate mitigating factor. West v. Thurston Cty., 168 Wn. App. 162, 190, 275 P.3d 1200 (2012); Lindberg v. Kitsap Cty., 133 Wn.2d 729, 747, 948 P.2d 805 (1997). Moreover, Hood overlooks the fact that the court awarded a minor increase in the penalty for lack of training. This was all within its discretion.

Hood argues that the court abused its discretion when it failed to impose a "reasonable alternative" to his proposed penalty awards.[205] He contends that the trial court should have considered the District's available economic resources rather than its size in determining what would be necessary to deter future misconduct.[206] But as the Supreme Court indicated in Yousoufian II, size of the agency may be a relevant consideration. 168 Wn.2d at 467.

Hood argues that the trial court erred "by overlooking, ignoring or misunderstanding many violations and minimally penalized them by lumping them together as 'technical non-compliance.'"[207] He contends that an agency will not be deterred from future violations that the trial court "vaguely labels as 'technical non-compliance' and does not appropriately penalize."[208] With this argument, Hood is referring to the trial court's determination that the per day penalty was sufficient "to address any and all issues related to the District's belated production of this material, *as well as any technical non-compliance with any provision of the Act.*"[209] Hood's argument is not persuasive. Essentially, the trial court determined that any

---

[205] Appellant's Am. Opening Br. at 60.
[206] Appellant's Am. Opening Br. at 60.
[207] Appellant's Am. Opening Br. at 43.
[208] Appellant's Am. Opening Br. at 44.
[209] CP at 239 (emphasis added).

other violations were de minimis. Because Hood's other asserted violations lack evidentiary support or were minor, this was not an abuse of discretion.

### Groups 1 and 5 Penalty Period

Hood argues that the court erred in calculating the lengths of time of the violations.[210] Specifically, he asserts that "[b]ecause the District withheld documents responsive to Hood's July 2011 requests until September 24, 2014, the trial court abused its discretion by not extending the Group 1 penalty period to 1,172 calendar days."[211] For the same reason, he also contends that the court should have extended the Group 5 penalty period to 1,058 days.[212]

We reject this argument. Hood failed to develop this argument at the trial court and fails to fully develop it on appeal. For this reason, we conclude that the trial court did not err when it calculated the penalty period.

### Motion for Reconsideration

Hood assigns error to the denial of his motion for reconsideration.[213] In his outline of the issues, he asserts that the motion for reconsideration "showed that the District's searches were unreasonable and the penalty period should have been extended to September 29, 2014."[214]

But Hood fails to present any argument about this assignment of error and issue in his briefing. "A party waives an assignment of error not adequately argued

---

[210] Appellant's Am. Opening Br. at 2.
[211] Appellant's Am. Opening Br. at 46.
[212] Appellant's Am. Opening Br. at 54.
[213] Appellant's Am. Opening Br. at 2.
[214] Appellant's Am. Opening Br. at 2.

41

in its brief." Milligan v. Thompson, 110 Wn. App. 628, 635, 42 P.3d 418 (2002). For this reason, we do not consider this issue.

## Attorney Fees

### *Attorney Fees at Trial*

Hood argues that the trial court abused its discretion when it awarded him only half of his fees for work performed during discovery.[215] We agree.

The PRA awards the prevailing party all costs, including reasonable attorney fees. RCW 42.56.550(4). The amount of attorney fees is within the discretion of the trial court. Sanders, 169 Wn.2d at 867. To calculate attorney fees, courts use the lodestar method, in which the court multiplies a reasonable attorney rate by a reasonable number of hours worked. Sanders, 169 Wn.2d at 869. In determining a reasonable number of hours, the court "discounts hours spent on unsuccessful claims, duplicated effort, or otherwise unproductive time." O'Neill v. City of Shoreline, 183 Wn. App. 15, 25, 332 P.3d 1099 (2014).

"A party in a [PRA] litigation may recover attorney fees only for work on successful issues. When a party may recover fees on only some of its claims, the award must reflect a segregation of the time spent on the varying claims. The court separates time spent on theories essential to the successful claim from time spent on theories related to other claims. But '[i]f the court finds that claims are so related that segregation is not reasonable, then it need not segregate the attorney fees.'" O'Neill, 183 Wn. App. at 25 (alteration in original) (footnotes and internal

---

[215] Appellant's Am. Opening Br. at 61.

quotation marks omitted) (quoting Dice v. City of Montesano, 131 Wn. App. 675, 690, 128 P.3d 1253 (2006)).

We review a trial court's ruling on attorney fees for abuse of discretion. Kitsap Cty. Prosecuting Att'y's Guild v. Kitsap Cty., 156 Wn. App. 110, 120, 231 P.3d 219 (2010).

Here, in his initial motion for attorney fees and costs, Hood stated that he "prevailed on approximately 50 [percent] of his claims" and had invoiced $85,436 in attorney fees and $3,174.86 in costs.[216] He requested that the court "find the percentage of the fees and costs requested reasonable."[217] As the trial court later indicated, it was not clear whether Hood was requesting all of the invoiced fees and costs or only a reasonable percentage of the fees and costs.

Thereafter, Hood and the District entered into a stipulation.[218] They agreed that Hood would withdraw his request for costs incurred after January 7, 2014.[219] Thus, the fees at issue were $10,320 in attorney fees and $283.95 in costs.[220]

The trial court found that "most of the time spent during the period in question was for preliminary investigation and discovery purposes, which time could not reasonably be segregated among claims or theories."[221]

The trial court then calculated the lodestar. It found that Hood's attorney spent 34.4 hours of attorney time between October 29, 2013 and January 7, 2014,

---

[216] CP at 132.
[217] CP at 135.
[218] CP at 2791.
[219] CP at 2791.
[220] CP at 42, 128.
[221] CP at 42.

and it found this to be reasonable.[222] The trial court also found that the attorney's hourly rate, $300, was reasonable.[223]

Finally, the trial court determined that Hood's claimed fees based on the lodestar should be reduced because "Hood prevailed on less than 2 [percent] of the penalties he sought," and because "Hood only prevailed on the claims that some documents were not timely produced pursuant to the requests in July and November of 2011, and to a minor extent on the issue of the aggravating factor of lack of proper training and supervision."[224] The trial court noted that Hood lost on at least seven other issues.[225] Accordingly, the trial court concluded that a 50 percent reduction in the amount of attorney fees was appropriate.[226]

As stated earlier, the court must discount hours for unsuccessful claims, duplicated or wasted effort, or otherwise unproductive time. Bowers v. Transamerica Title Ins. Co., 100 Wn.2d 581, 597, 675 P.2d 193 (1983). But a court accomplishes this by discounting hours when calculating the lodestar. See Chuong Van Pham v. City of Seattle, 159 Wn.2d 527, 539, 151 P.3d 976 (2007). After the lodestar has been calculated, adjustments to the lodestar are appropriate under two broad categories—the contingent nature of success and the quality of work performed. Bowers, 100 Wn.2d at 598.

Here, the trial court did not discount hours for unsuccessful claims when it calculated the lodestar. Rather, it discounted for unsuccessful claims *after* it had

---

[222] CP at 42, 45.
[223] CP at 45.
[224] CP at 45.
[225] CP at 45.
[226] CP at 45.

calculated the lodestar. Because this is not a proper reason to adjust the lodestar, the trial court abused its discretion.

*Attorney Fees on Appeal*

Hood requests attorney fees and costs under RCW 42.56.550(4).[227] "A party who prevails in a PRA appeal is entitled to attorney fees whether he prevails in whole or in part." Bricker v. Dep't of Labor & Indus., 164 Wn. App. 16, 29, 262 P.3d 121 (2011). Because Hood prevails on the attorney fee issue, he is entitled to a limited award of attorney fees under RCW 42.56.550(4).

CONCLUSION

We affirm the judgment, reverse the award of attorney fees and costs, and remand for further proceedings. We direct the trial court on remand to determine an appropriate award of attorney fees on appeal. RAP 18.1(i).

Trickey, ACJ

WE CONCUR:

---

[227] Appellant's Am. Opening Br. at 63-64.